## UPTON v. WHITAKER et al.

(Circuit Court of Appeals, Sixth Circuit. May 15, 1912.)

No. 2,203.

COLLISION (§ 102*)—STEAM VESSELS MEETING—FAULT.

A collision occurred at night in Detroit river between the steamer Gault, going up, and the steamer Whitaker, coming down, at a point where the dredged channel widened abruptly to the south and east. The Gault was going up near the east side of such widened channel, and so continued until she reached the shoulder, and then turned westward, striking the Whitaker as she came from the mouth of the narrower channel. The vessels had exchanged signals for passing port and port. *Held*, that the Gault was clearly in fault for not either crossing over sooner so as to get on a course parallel to that of the Whitaker, or slowing until the latter had passed before crossing; also, *held* on the evidence that the Whitaker was on the proper side of the channel, and was not chargeable with contributory fault in view of the rule that, where the fault of

one vessel is sufficient to account for a collision, the fault of the other must be clearly established.

[Ed Note.—For other cases, see Collision, Dec. Dig. § 102.*

Signals of meeting vessels in collision, see note to The New York, 30 C. C. A. 630.]

Appeal from the District Court of the United States for the Eastern District of Michigan.

Suit in admiralty by Charles Whitaker and others, owners of the steamer Whitaker, against the steamer Gault, Frank S. Upton, claimant. Decree for libelants, and claimant appeals. Affirmed.

In Detroit river, a few miles below Detroit, is situated an artificially improved channel in connection with what is known as the "Lime Kiln Crossing." In May, 1907, the improvement work was in progress. In that part of the channel here involved, the range lines indicated upon the charts, for the information of navigators, were for the upward bound vessels, first upon the Elliott Point ranges, and then swung into and were upon the Lime Kiln Crossing ranges. The range lights in each case were at the downstream or southerly end of the range. Adjacent to the point of range intersection, the upper part of the channel, as then staked and buoyed, was 300 feet wide, being 150 feet on each side of the Lime Kiln Crossing range line. The east side line of the channel was straight and parallel to the range. The west side line was irregular, but at two points, one of which is the critical point in question, it approached to within 150 feet of the range, and the intermediate western widening is therefore immaterial. Near the point of range intersection, the easterly boundary of this marked channel swung out rapidly to the east and then turned again southerly parallel to the range line and distant 300 feet therefrom. The channel may, therefore, be roughly compared, at least upon the easterly side, to a bottle with a long narrow neck. The point corresponding to the base of the neck, where the side line turned out at an angle to form the wider body, is marked by what is called in this record the red spar or the red buoy, and was indicated at the time in question by a red float light. On the evening of May 12, 1907, the steamer Gault, 218 feet long, 32 feet beam, and 1,450 net tons, was up bound, laden with coal, and the steamer Whitaker, 220 feet long, 38 feet beam, and of 1,400 net tons, was down bound, laden with corn. The two steamers came in collision at a point not far from this red spar, and the Whitaker was sunk. The appellees, as owners of the Whitaker, libeled the Gault. Proceedings were had to limit the liability, the Gault was surrendered and sold, and the controversy has proceeded over the fund in court. The only question now involved is that of fault as between the two boats.

The court below found that the Gault was solely in fault, and rendered judgment accordingly. The appellant, as claimant of the Gault, insisted that the Whitaker was solely in fault, or, if not, that the damage should be divided, and appeals to this court upon the same contentions.

H. A. Kelley (Hoyt, Dustin, Kelley, McKeehan & Andrews, of counsel), for appellant.

Robert Gray (Gray & Gray, on the brief), for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). We are satisfied that the Gault cannot escape blame. The finding of the District Judge was that the collision occurred in the lower and wider part of the channel, and as the result of the Gault's sudden and inexcusable sheer. This conclusion would end all controversy; but we prefer to rest the liability of the Gault

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

upon a somewhat broader ground, and one which is not complicated, as the other is, by a great mass of conflicting testimony, but depends on the undisputed facts. The vessels had in due time exchanged signals, and had agreed upon a meeting port to port. The Gault was coming up along what may be called the easterly edge of the body of the bottle, 300 feet away from the range line, and was approaching the shoulder leading over to the neck. The Whitaker was coming down in this narrow neck. Her exact position, laterally in this channel, is in dispute; but it is clear that she had a right to be following the range line, and only yielding, or being prepared to yield, so much as would give room for a safe meeting. It is also clear that the Gault, from her position, was observing the Whitaker's lights from a considerable angle, and could not exactly place her laterally in the channel, and so was bound to assume that the Whitaker was, or might be, where she had a right to be, viz., substantially on the range line. Further, the Gault being up bound, in a current of 2 or 2½ miles an hour, had full control of her own course and speed, could estimate fairly well the speed at which the Whitaker was coming down, and knew the difficulties attending the handling of a down-bound boat in such a channel and in such a current. If, therefore, the meeting was, as the Gault claims, exactly abreast of the red light, the Gault was bound to know, with substantial accuracy, that it would occur at that place. So it appears that the Gault, knowing or being bound to know that the Whitaker might be passing the red light at the very moment the Gault reached the same point, nevertheless starboarded and followed westerly along the shoulder of the bottle, coming out into the narrow neck channel at an angle which on that course would have taken her bow well over toward the central or range line before her stern passed the red light. It would be quite possible to accomplish this at the moment a down-bound boat was passing slightly west of the range line and to avoid collision, but this possibility, and, indeed, the probability that it could be successfully done nine times out of ten, do not remove the inherent danger of the movement. A very slight mistake in the steering of the boat or a misconception of the deflecting force of the current at that point, or any one of several other causes, might cause the boat to come into the narrow channel at a wider angle or to carry her further over into such narrow channel than was intended, and so might cause exactly what did happen here.

This maneuver is not to be excused because it was necessary; for it was wholly unnecessary. If the Gault chose to come up the easterly edge of the channel and close along the shore as she did, a trifle of additional slowing so as to be sure that the Whitaker was clear of this part of the channel before the Gault attempted to swing into it would have avoided the accident, and would not have cost two minutes of time. Again, if the up-bound boat, some distance below the so-called shoulder of the bottle, had swung over on to or near to the Elliott Point range line and then followed up parallel with that line she could have seen the lights and judged the course of the Whitaker to better advantage, the change of direction into the new course would have been as gradual as desired, and the specific danger would never have de-

veloped. Nor is it important if, as claimed, vessels frequently meet at this point, and do not regard it as dangerous. An up-bound boat, following the Elliott Point range, would swing her bow to starboard about one point to take the Lime Kiln Crossing range, and this swing would be away from the course of a down-bound boat and would tend to safety. This, doubtless, was the kind of meeting which was common at this point; but a boat in the Gault's position was compelled first to swing to port, over toward the course of the other boat. This was a swing into danger, and to make that swing under such circumstances was careless, if not reckless, navigation. We do not overlook the rule, or rather the exception, that one of two approaching vessels may swing toward the course of the other when required by the turns or angles of the channel (Lake Erie Transp. Co. v. Gilchrist Co. [C. C. A. 6] 142 Fed. 89, 95, 73 C. C. A. 313); but we find no decision of this character which justifies unnecessarily cutting into a narrow channel at the very instant the other boat is passing. This case is not one where both boats must turn at the same point, and so, if they are to reach it at the same time, each may anticipate a simultaneous swing by the other. The Whitaker could be expected to turn very little, if at all. The Gault selected that moment for such a maneuver that, even if the Whitaker was well on her own side of the range, still the Gault could not miss her by more than 100 feet. That distance may not be dangerous when the vessels meet on parallel courses. It is dangerous under the situation here existing. We conclude, therefore, that the Gault was at fault.

A more difficult problem arises as to the fault of the Whitaker. The vital question may be formulated as being whether the Whitaker, when opposite the red light, was on her own side of the range, and at least 175 or 200 feet away from the light, or whether she was over on the wrong side of the channel and within 50 or 100 feet of the light. The two lights of the range, according to which the Whitaker was taking her course, were over the bow and less than one mile away. The night was clear, and these lights were perfectly visible. The universal testimony from the Whitaker is that these lights were continuously open to the west, and it necessarily follows, if this is true, that the Whitaker was continuously well to the westward of the range line, and hence well westward of the center of the channel. This testimony is clear, positive, and certain, and there is little or no opportunity for mere mistake. On the other hand, the captain of the Gault had no accurate means of locating himself with reference to this range at this time, and nothing definite to tie to excepting that, when he struck the Whitaker, he was close to the red light. This state of the proof makes, as we think, a clear, initial preponderance in favor of the Whitaker. Since, upon the undisputed facts, we find the Gault guilty of "fault sufficient to account for the disaster," the contributing fault of the Whitaker must be very clearly and satisfactorily established. The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 216, 31 L. Ed. 84; The Chisholm (C. C. A. 6) 153 Fed. 704, 713, 82 C. C. A. 562, 571. It only remains to determine whether this initial preponderance is destroyed and the contrary conclusion clearly established by the four matters to which we now allude:

(1) The Whitaker's captain testified that for some distance above the point of collision, and while going down through the narrow channel, and while pursuing a course substantially parallel to the range line and westward therefrom, he maintained his heading directly upon the front light of the Lime Kiln Crossing lights, and kept his stern bearing directly upon the lightship marking the westerly edge of this 300 foot channel. For the greater part of this channel there is a sharp cross-current to the westward, and several expert navigators testified that the method described by the captain would have carried him ashore on the west bank of the channel. It is therefore said that the captain's testimony should be rejected. Obviously, if the captain is held literally to his description, he described an impossibility. A vessel cannot, in a cross-current, be headed upon, and maintain itself upon, a straight line, but the heading and the resulting bearing of the stern must be modified to compensate for the cross-current. It appears from the testimony of the experts that there would be no difficulty in maintaining the course which the captain says he maintained, if his heading had been slightly modified, as it would have to be and as he must have known it would have to be. The fact that he recited an obviously impossible condition attendant on maintaining his described course does not require us to believe that he did not take that course. He was not cross-examined as to this inaccuracy, and it disappears entirely, if we accept in a substantial, rather than a literal, sense his description of his heading. A navigator, not choosing his words with mathematical nicety, might well say he was heading on the front light when he meant he was heading as was necessary to keep him on the direct course for that light; and it is more reasonable to suppose he was intending to describe a natural handling of his boat than that he intended to describe an impossibility.

(2) It seems to be the fact that the captain of the Whitaker, seeing the Gault come so far up the river and so far to the eastward, supposed that she was going to come up on the east side of the red light, as, in fact, might have been done; but this would only have furnished some excuse for the captain of the Whitaker to come down east of the range line and close to the red float light. It does not prove, nor indeed tend to prove, that he did do so, and is not of much importance as against the proof as to his exact position.

(3) When the captain of the Whitaker was asked to state the distance of the red light from his port side as he was opposite it, he said he did not know exactly, it was "probably 100 feet; probably further." If this was to be taken as establishing that he was not more than 100 feet from the light, then it showed he was on the wrong side of the channel and was in fault. However, the context, as well as this answer itself, shows that he was giving only an estimate, and that he did not intend to limit the distance to 100 feet. He had, by his preceding answer, estimated the distance at the same moment from the west side of the 300 foot channel as only 50 feet. His estimates were, therefore on their face, inaccurate; and being satisfied, as we are, that the captain of the Whitaker was intending to tell the truth about the transaction, we regard this as an unintentional inaccuracy attending upon

what was only approximation rather than as a deliberate placing of his vessel at a point where she could not have been, unless the main features of his testimony and of his crew were deliberately false. ·

(4) Just before the collision, after the Gault had given an order to port and was just beginning to swing her bow to starboard in an effort to avoid the collision, the Whitaker backed. The effect of this backing, if there was time for it to take effect, was to swing her stern to port and towards the course of the Gault. This action is relied upon to charge the Whitaker with fault. It is not sufficient for that purpose. It is not clear that this backing did contribute to the collision, since the stem of the Gault struck the Whitaker near the latter's bow, and, even without the backing, it is only surmise that the collision would have been avoided; but, in any event, this order to back was given when the disaster was imminent and within not more than a minute before the actual collision. Under such circumstances, it was action taken in extremis, and, even if it was fault, it would not be condemnatory. The Atlantis (C. C. A. 6) 119 Fed. 568, 572, 56 C. C. A. 134.

The judgment of the court below will be affirmed, with costs.