WESTERN TRANSIT CO. v. DAVIDSON S. S. CO.

(Circuit Court of Appeals, Sixth Circuit. March 13, 1914.)

No. 2416.

1. COLLISION (§ 95*)—STEAMER AND TOW MEETING IN NARROW CHANNEL—DUTY OF FREE VESSEL.

When vessels are to meet in a narrow winding channel, and one of them, being free, can absolutely control her own motions, while the other, being with a tow carried on a towline, can neither stop nor back, and cannot move at all except as the safety of the tow is also considered, this fact alone is sufficient to put upon the free vessel a considerable burden of duty to so handle her own speed and position and to so select the exact place of meeting as to minimize whatever unavoidable danger there may be.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

2. COLLISION (§ 95*)—STEAMER AND TOW MEETING IN NARROW CHANNEL—
MUTUAL FAULTS.

A collision in Portgage river, Mich., between the steamer Troy, passing
up alone, and the barge Chieftain, coming down in tow on a 200-foot line,
*held* due to the fault of both vessels; the Troy being primarily in fault
for meeting the barge at a bend in the channel where, if the barge failed
to make the turn properly, collision was inevitable, while by slowing or
stopping a very short time the vessels would have met in a straight chan-
nel; and the Chieftain being in fault for not being more carefully navi-
gated around the turn after passing signals had been exchanged.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200-202; Dec.
Dig. §.95.*]

3. ADMIRALTY (§ 85*) — REFERENCE TO COMMISSIONER — CONCLUSIVENESS OF
FINDING.

The rule, which governs in equity where a reference is made by consent
of parties, that a finding of fact by the master is unassailable if there is
any testimony consistent with it, is not so strict in case of an ordinary
reference by a court of admiralty to a commissioner to take proof of dam-
ages and compute and report the same, and, while the commissioner's
findings on conflicting evidence are presumptively right and should not be
lightly disturbed, the court should not hesitate to exercise its own judg-
ment and reach a contrary result when clearly convinced that the finding
is wrong.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 619, 620; Dec.
Dig. § 85.*]

4. COURTS (§ 371*)—SUIT FOR DAMAGES—INTEREST.

Damages awarded for a collision which occurred within the jurisdiction
of a state should bear interest, both before and after decree, at the legal
rate established by statute in the state.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 907, 972–976; Dec.
Dig. § 371.*]

Appeal from the District Court of the United States for the Eastern
District of Michigan; Henry H. Swan and Clarence W. Sessions,
Judges.

Suit for collision by the Davidson Steamship Company, owner of
the barge Chieftain, against the steamer Troy; the Western Transit
Company, claimant. Decree for libelant, and claimant appeals. Re-
versed.

J. B. Richards and Harvey L. Brown, both of Buffalo, N. Y.
(Brown, Ely & Richards, of Buffalo, N. Y., of counsel), for appellant.

H. D. Goulder and F. S. Masten, both of Cleveland, Ohio, for ap-
pellee.

Before KNAPPEN and DENISON, Circuit Judges, and COCH-
RAN, District Judge.

DENISON, Circuit Judge. The steamer Troy, belonging to the
Western Transit Company, was libeled by the Davidson Steamship
Company on account of damages suffered by its barge Chieftain, while
being towed by its steamer Orinoco. A collision occurred in the
Portage river. The Troy was bound for Duluth, and shortly after
entering from Lake Superior into the lower end of the river channel,
and while below "cut No. 1," gave a port to port meeting signal, and
the Orinoco, then coming down the river at a point about a half mile

above, agreed. The size of the boats, the particular surroundings of the place, and the position of the boats in collision, according to the theories of the respective parties, appear by the following plats, based upon the Lake Survey charts. The channel in cut No. 1 was about 200 feet wide, somewhat wider in the open water next above, and narrowed to 120 feet in the reach from which the Chieftain was emerging.

SKETCH No. 1.

SKETCH No. 2.

Irregular dotted lines show channel banks; straight dotted lines are range courses.

It is claimed by the Troy that she was kept headed to starboard as far as practicable, and that the Chieftain swung to port and came across the bows of the Troy, away over upon the Troy's side of the channel, and that the collision happened just as the Troy was swinging to starboard, while clearing cut No. 1. It is the Chieftain's claim that, upon a 200-foot towline, she was following the Orinoco and was keeping as close as possible to the bank (which here was a revetment) on her starboard; that passing the end of this revetment she began to make the turn to starboard, but that the Troy came over into the Chieftain's side of the channel across the Chieftain's course, and then struck the latter on her starboard bow, a few feet aft of the anchor hawse pipe.

At the outset, we think it necessary to determine the conflicting question of fact presented by these two theories. It would be useless to discuss all the evidence, but, upon the whole, we are clearly satisfied that the theory of the Troy is correct; and that the collision occurred substantially at the point and in the manner shown by sketch No. 1. If we examine the Chieftain's claim that she was at the point shown on sketch No. 2, and was successfully making her turn to the starboard, it is not impossible (as at first glance it appears to be) that the 400-foot Troy could have passed through the space between the Orinoco and the Chieftain, and swung around and struck the latter from the other side, inflicting the kind of a blow given and at the spot where received —but though not impossible, this is highly improbable. It is to be noted also that shortly before the collision the Chieftain's captain had dropped his starboard anchor, thus indicating that his vessel was swinging to port beyond the control of her rudder, or at least that the rudder was insufficient to turn the bow to starboard as desired; and by this fact the improbability of the Chieftain's claim is increased. Then we have the final, controlling circumstance, by testimony from the Chieftain's crew, that just before the boats came together they saw a red spar under their port bow. There seems no reason to doubt that this must have been "Red Spar No. 2," because "Red Spar No. 2A," though it was shown by the charts which were before the witnesses at the time they were testifying, was in fact not placed until the year after the collision. Any possibility of reconciling the Chieftain's testimony about the red spar with its present theory that the collision occurred at the point shown by its sketch depends upon a mere guess, supported by no testimony, that there may have been a red spar unknown to the records of the Lake Survey in the same place where No. 2A was afterwards set. Taking the testimony all together, we are clearly satisfied that the collision occurred as shown on sketch No. 1.

[1] The district judge found that the Troy was in fault in allowing the meeting to take place at this necessarily dangerous turn in a narrow channel. With this result we agree. We do not, however, base this conclusion on Rule 24 and the principles governing boats moving with or against current or tide. "Portage Entry and River" is a channel four or five miles long, connecting Lake Superior and Portage Lake. It runs through marshy ground. Normally there is a slight current from Portage Lake to Lake Superior. There is another

outlet to Lake Superior from the opposite side of Portage Lake, and under suitable wind conditions the current may be the other way. The evidence conflicts as to whether on the day in question there was 'any current; and rights should hardly be fixed with reference to a conventional current in a channel where the navigators may not be able to tell which way the actual current is running—at least, if resort may be had to any other applicable rule and clearer standard. In our judgment, the fault of the Troy sufficiently depends on the fact that she was alone, while the Orinoco was burdened with a tow. When vessels are to meet in a narrow, winding channel, and one of them, being free, can absolutely control her own motions, while the other, being with a tow carried on a towline can neither stop nor back and cannot move at all except as the safety of the tow is also considered this fact alone is sufficient to put upon the free vessel a considerable burden of duty so to handle her own speed and position, and so to select the exact place of meeting, as to minimize whatever unavoidable danger there may be. We do not find that this duty has been declared quite so explicitly as in the language just used, and in a case where neither current nor tide was important; but we think we fairly state the necessary result of applying the rule of ordinary care. See The Syracuse, 9 Wall. 672, 675, 19 L. Ed. 783; The Saratoga (D. C.) 1 Fed. 730, 732; The Owego (D. C.) 71 Fed. 537.

[2] In the instant case the Troy unnecessarily proceeded to a point where, if for any reason the Chieftain kept on past the proper turning point for only her own length without making the turn properly and successfully, a collision must happen; while by slowing a little more, or by stopping for two minutes down in the straight channel of cut No. 1, there would have been ample opportunity either for the Chieftain to straighten up and recover her rightful position, or, if she did not do so, for the Troy to have remained in a place of safety. The Troy must be condemned.

Our finding as to the manner and place of collision leads inevitably to the conclusion that the Chieftain was also in fault. Possibly some unexplained bottom or bank conditions caused her to sheer to port, or, what is practically the same thing, to refuse to mind her helm and come to starboard; perhaps more probably, her steersman, through inattention or misjudgment, did not port until too late. The Chieftain had only to fail to make the turn at exactly the right point, and to continue on her former course for 300 feet after she should have turned, to get her nearly into the position where we have found she was. Upon either supposition, she does not escape a contributory liability; her fault is clear enough to satisfy the requirement that, when the primary liability is placed elsewhere, the contributing fault must be very clear. Upton v. Whitaker (C. C. A. 6) 196 Fed. 651, 654, 116 C. C. A. 343. It necessarily follows that the damages must be divided, and the Chieftain must carry one-half of her loss. See The George Presley (C. C. A. 6) 111 Fed. 555, 49 C. C. A. 438.

[3] After the collision the Chieftain was taken to Bay City and put into dry dock. This dry dock belonged to the same James Davidson who, with his family, held all the stock of the corporation which own-

ed the Chieftain. The boat remained in dry dock for 30 days, during which time the dock was not occupied by any other vessel, and the Chieftain was extensively repaired in respects having nothing to do with the collision. A considerable part of those repairs which did not follow from the collision could as well have been made outside of the dry dock. Of the other repairs some, like caulking the entire bottom, required its use, and others, like painting the decks, could have been done outside. For its use the owner of the dry dock charged the owner of the boat $162.24 for each one of these 30 "lay days." We are quite satisfied that, for the reasons suggested in the facts we have just recited, at least one-half of this time was unnecessary for the repair of the damage caused by the collision; and that the allowance for "lay days" should be reduced from $4,867.20 to one-half that sum.

The district judge seems to have based his allowance of the full sum not so much upon his own consideration of the proofs as upon the fact that there was conflicting evidence, and upon the assumed rule that, if there is evidence amply supporting a commissioner's finding, that finding should not be disturbed. The rule has sometimes been stated as broadly as this; indeed, in Davis v. Schwartz, 155 U. S. 631, at page 636, 15 Sup. Ct. 237, at page 239 (39 L. Ed. 289), Mr. Justice Brown said: "So far as there is any testimony consistent with the finding, it must be treated as unassailable." He was speaking in a case involving a master's report in equity; but the practice of giving effect to a commissioner's finding in admiralty is based on its analogy to the usual master's finding (The Cayuga [C. C. A. 6] 59 Fed. 483, 488, 8 C. C. A. 188; The La Bourgogne [C. C. A. 2] 144 Fed. 781, 783, 75 C. C. A. 647); hence the effect should be the same. The conclusion in Davis v. Schwartz, that the finding was "unassailable," if that conclusion is to be treated as a thing decided, may well depend on the circumstance that the reference to state facts was by consent of parties, thus creating practically an arbitration, like a trial before a United States District judge under R. S. 649. See our discussion of Davis v. Schwartz in Haines v. Bank, 203 Fed. 225, 228, 121 C. C. A. 431. We think in the ordinary case of a reference by the equity court to its master "to take proofs and report his findings of fact and law," or by the admiralty court to its commissioner (as here) "to take testimony of such damages and to compute and report same," it has never been intended to hold that the finding or report should have any greater force than is implied by the criterion, "clearly against the weight of the evidence" (The La Bourgogne, supra, 144 Fed. at page 783, 75 C. C. A. 647; The Elton [C. C. A. 4] 83 Fed. 519, 520, 31 C. C. A. 496), or, "unless error clearly appears" (Tilghman v. Proctor, 125 U. S. 136, 150, 8 Sup. Ct. 894, 31 L. Ed. 664), or our own formula, "a decided preponderance against the judgment" (In re Snodgrass, 209 Fed. 325, 326, 126 C. C. A. 251; Carey v. Donohue, 209 Fed. 328, 333, 126 C. C. A. 254). We think that to carry the authority of the finding beyond these standards would be in effect to deprive the parties of the right to a hearing de novo on appeal; and that, while the master's or commissioner's findings on conflicting evidence are presumptively right and should not be lightly disturbed, yet the District Court

should not hesitate to exercise its own judgment, and reach a contrary result, when clearly convinced that the finding is wrong.

Judged in this way, the allowance for more than half of the 30 lay days cannot stand. It is undisputed that the boat was getting the benefit of a general caulking, which would otherwise have required docking the next season, and that the entire job was done in a deliberate fashion, with a small force. The very persuasive proof that half the work could have been done after floating the vessel outside of the dock has nothing definite to dispute it, except Mr. Davidson's final claim that the stem was out of line and had to be held rigidly braced from the sides of the dock until the work was finished. Not only was the twisting of the stem not discovered in the original survey in which this witness participated, but the boat was in fact floated in the dock on one occasion during these lay days. The situation is very similar to that arising in the Second circuit regarding lay days in this very dock. The Bourke (D. C.) 135 Fed. 895; s. c. (C. C. A. 2) 145 Fed. 909, 76 C. C. A. 441.

The finding of damages, as modified and affirmed by the district judge, forms the subject of further complaint in several particulars. We think it unnecessary to recount these in detail. In each of these particulars, under the rule which we have stated as to the force of the master's findings and under the analogous rule as to the force to be given by us to the double findings now existing, they should be affirmed. Constam v. Haley (C. C. A. 6) 206 Fed. 260, 124 C. C. A. 128.

[4] The decree gives interest at 6 per cent. Since this case was heard below, we have decided, in Cambria S. S. Co. v. Pittsburgh S. S. Co., 212 Fed. 674, 128 C. C. A. ——, decided January 6, 1914, that where the collision occurred and suit is brought in Michigan, the proper rate of interest is 5 per cent., the legal rate in that state; and only 5 per cent. can be allowed here.

The decree below is reversed, and the case remanded, with instructions to enter a decree in accordance with this opinion. The appellant will recover the costs of this court.