CHICAGO, D. & G. B. TRANSIT CO. v. MOORE et al. *

(Circuit Court of Appeals, Sixth Circuit. June 30, 1919.)

No. 3258.

1. EVIDENCE ⬅️596(1)—CIVIL ACTION—PREPONDERANCE OF EVIDENCE.

In a civil action, proof need not be beyond all possible doubt, but a preponderance of the evidence, or a showing of a greater probability, is all that is required.

2. ADMIRALTY ⬅️118—REVIEW—FINDING.

A decree of the District Court in admiralty, the testimony being taken in open court, should be accepted on an appeal, unless the evidence clearly preponderates against it.

3. SHIPPING ⬅️166(4)—CARRIAGE OF PASSENGERS—IMPURE DRINKING WATER —EVIDENCE—SUFFICIENCY.

On libel by a number of passengers on respondents' vessel, evidence *held* sufficient to sustain a finding that they were supplied with water infected with typhoid fever germs.

4. SHIPPING ⬅️166(4)—CARRIAGE OF PASSENGERS—IMPURE WATER—EVIDENCE —SUFFICIENCY.

On libels by passengers on a steamship, evidence *held* to warrant a finding that they contracted typhoid fever from drinking polluted water which was furnished by the vessel.

5. SHIPPING ⬅️166(4)—CARRIAGE OF PASSENGERS—IMPURE WATER—EVIDENCE —SUFFICIENCY.

Evidence *held* to warrant a finding that one passenger on respondents' vessel contracted arthritis, resulting from an intestinal infection from drinking impure water furnished on the vessel.

6. SHIPPING ⬅️166(4)—CARRIAGE OF PASSENGERS—IMPURE WATER—EVIDENCE —SUFFICIENCY.

Evidence *held* to warrant a finding that one passenger on respondents' vessel contracted typhoid fever resulting from impure drinking water furnished by the vessel, and that gallstones resulted therefrom.

7. SHIPPING ⬅️166(4)—CARRIAGE OF PASSENGERS—IMPURE WATER—EVIDENCE —SUFFICIENCY.

Evidence *held* insufficient to warrant a finding that a passenger on a vessel, who became ill, suffered from typhoid or paratyphoid fever contracted from drinking impure water furnished by the vessel.

8. SHIPPING ⬅️166(4)—CARRIAGE OF PASSENGERS—IMPURE WATER—EVIDENCE —SUFFICIENCY.

A finding that a passenger on a vessel, as the result of drinking impure water furnished, contracted typhoid fever, which caused a rectal abscess, *held* warranted.

9. ADMIRALTY ⬅️118—REVIEW—CIRCUIT COURT OF APPEALS—ADMIRALTY CAUSES.

The hearing of an admiralty appeal in the Circuit Court of Appeals is, in view of the history of such appeals, and prior to the creation of the Circuit Court of Appeals, treated as a hearing de novo.

10. DAMAGES ⬅️131(1)—PERSONAL INJURIES—MEASURE.

An award of $1,500 for pain and suffering in favor of passengers on a steamer, who contracted typhoid fever as a result of drinking impure water furnished, *held* not excessive.

11. DAMAGES ⬅️132(1)—PERSONAL INJURY—MEASURE.

An award of $2,000 for past and future suffering, as well as $1,500 for medical expense, in favor of a passenger on a steamer who contracted typhoid fever, which resulted in gallstones necessitating an operation, *held* not excessive, where the wound made by the operation never healed, and a drainage tube had to be inserted, etc.

---

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 250 U. S. ——, 40 Sup. Ct. ——, 64 L. Ed. ——.

**12. DAMAGES ☞133—PERSONAL INJURIES—BUSINESS LOSSES.**

An award of $7,500 for loss of time from business in favor of a passenger on a steamer who contracted typhoid fever resulting in gallstones, as the result of drinking impure water furnished, *held* not warranted, and it should be reduced to $1,000.

**13. DAMAGES ☞133—PERSONAL INJURIES—BUSINESS LOSSES.**

An award of $7,000 for loss of time from business in favor of a passenger who contracted arthritis as a result of an intestinal infection caused by drinking impure water furnished on respondents' vessel, *held* not an excessive award for the passenger's loss of time.

**14. DAMAGES ☞130(1)—PERSONAL INJURIES—MEASURE.**

Where a passenger on a vessel who owned and conducted a grocery business contracted typhoid fever as a result of the impure drinking water furnished, causing loss of time, etc., *held* that an award of $7,500 for pain, suffering, and expense and loss of time was excessive by $2,500.

**15. DAMAGES ☞46—PERSONAL INJURIES—ITEMS.**

Where two sisters, passengers on a steamer, contracted typhoid fever as a result of drinking impure water furnished, *held* that they could recover for medical expenses, and the expense of nurses, though such sums were paid by their parents.

**16. HUSBAND AND WIFE ☞209(4)—PERSONAL INJURIES—ITEMS.**

Where a passenger on a steamer contracted typhoid fever as a result of impure drinking water furnished, *held* that he might recover for the value of his wife's services in nursing him.

**17. DAMAGES ☞130(1)—PERSONAL INJURIES—MEASURE.**

On a libel by a passenger on a steamer who contracted typhoid as a result of impure drinking water furnished, *held* that an allowance of $216 for medical services and drugs, plus $80 for four weeks' services of the passenger's wife in nursing him, together with an award of $250 for two months' loss of business, as well as an award of $2,000 for pain and suffering, was not excessive.

**18. ADMIRALTY ☞118—REVIEW—INTEREST—AWARD.**

On a libel by passengers of a vessel who contracted typhoid fever from drinking water furnished, where the interlocutory decree and order of reference was dated June 28, 1917, and the master's report was dated May 25, 1918, *held* that, where it did not appear that delay resulted from the wrongful act of respondent owner of the vessel, or that the discretion of the trial court had been abused, an award of interest from the date of report only will not be disturbed.

Appeal from the District Court of the United States for the Southern Division of the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Libels by Charles T. Moore and others against the Chicago, Duluth & Georgian Bay Transit Company, sole owner of the steamship South American. From decrees for libelants, respondent appeals. Affirmed as to all libelants save three.

Chas. E. Kremer, of Chicago, Ill., for appellant.

Geo. E. Brand and Arthur Kilpatrick, both of Detroit, Mich., for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. Appellees, 11 in number, filed libels in rem for recovery of damages by reason of illnesses alleged to have

been caused by tainted food and contaminated water asserted to have been served to libelants while passengers on the steamer South American on an excursion in July, 1915, from Detroit to Houghton, Mich., except that in Campbell's libel injuries to his daughter Elizabeth were alone involved, and that Ballard's was filed solely on account of injuries to his daughter Dorothy. Each of the 11 passengers in question was ill on the boat, and each on returning home developed a serious illness. The District Judge found that a comparatively small quantity of tainted duck and meat was negligently served to the passengers, and that contaminated water was also negligently provided for them; but, while expressing a suspicion that some of the illnesses on the boat may have been aggravated by eating the tainted food or drinking the contaminated water, was of opinion that libelants had not sustained the burden of proving that such illnesses were caused thereby, and accordingly denied recovery for illnesses on shipboard. It was, however, found as a fact that each of the libelants received from the contaminated water the disease germs which caused their illnesses after the return of the boat to Detroit; the illness of nine of the libelants being found to have been typhoid fever, and in the case of each of the other two an illness closely allied to typhoid. There was interlocutory decree, with reference to a master commissioner to take testimony and report the nature of the respective illnesses and the respective damages there from; the steamer being declared liable for all illnesses "which might reasonably be traceable to impure drinking water partaken of on the trip." In Moore's case the steamer was expressly declared liable for the typhoid fever as also for a gallstone trouble, provided that trouble was found to be due to drinking the impure water. The commissioner found and reported that Moore's gallstones were so caused, and that the illness of each of the other libelants might reasonably have been caused by the furnishing of the impure drinking water on the trip; the illness of seven of the libelants being found to have been typhoid fever, those of Lawrence and Hudson "typhoid or paratyphoid," that of Town an "intestinal affection," and that of Mallotte arthritis. There was an award of damages to each libelant. The claimant and five of the libelants excepted to the report, and each party moved for a reopening of proofs. All exceptions and both motions were overruled, and final decree entered in accordance with the master's report.

1. We have no difficulty in affirming the conclusion that contaminated water was, during several hours at least, and through the steamer's negligence, provided for the passengers on the South American.

The boat was provided with a sterilizer and a filter, and normally only sterilized and filtered water was served to passengers. However, between 10:30 and 11 p. m. on Sunday, June 6th, the boat ran aground in Hay Lake (which is a broadening out of St. Mary's river), about 12 miles below the Soo; her sea cocks, from which water is supplied to the boat, being imbedded in the mud. She was not released until between 4 and 5 a. m. of the following day, which was Monday, June 7th. Meanwhile the water in both ballast and fresh-water tanks had been exhausted for power purposes. When the boat was released water was pumped directly from the river into the fresh-water system,

without being sterilized or even filtered, and without any attempt to get rid of the mud in the sea cocks except by blowing out with steam. This fresh-water system supplied all the faucets in the staterooms as well as the drinking fountains in the saloon. The ship's officers recognized the river water taken on as unfit to drink and did not themselves drink it. The crew were not allowed to drink it, and the faucet ordinarily available to them was wired up. The steward would not serve it on the table, and so no water was served at either breakfast or luncheon on the seventh. But neither the faucets in the staterooms nor the fountains in the saloon were sealed, nor was any notice given to passengers that the water obtainable therefrom was not wholesome. In this the steamer was clearly negligent; for, as the District Judge well said, it could not be assumed that passengers would refuse to drink the water merely because it was roily. That it was drunk by many of the passengers is well established. Indeed, the non-service at table and the lack of ice water would naturally tend to increase the consumption of the available water.

The record indicates that the water of the St. Mary's river at the point from which the water in question was taken was unfit for human consumption. The published report of the International Boundary Commission, investigating the pollution of boundary waters, found in 1913 that the water of that river was polluted by sewage not only from boats, but (below the American and Canadian Soos) by the passage directly into the river of the sewage not only of both those towns, but of Steelton, practically a suburb of the Canadian Soo. In the neighborhood where the water in question was taken the colon bacillus was found in as small a quantity as one-tenth of a cubic centimeter of water. This conclusively proved the water dangerous to drink, not because the colon bacillus causes fevers such as typhoid, for it does not, but because it is an intestinal germ, and its presence, to the extent stated, shows the presence of excreta from feces and urine; and because the bacillus typhosus, or typhoid germ, which is said not to be capable of direct isolation in water (although there is seemingly evidence to the contrary), and which expelled in the feces and urine of a patient (and thus where it exists accompanies the colon bacillus) furnishes, in the form of drinking water, the most potent source of typhoid infection, in the general acceptance of the medical profession.

[1-3] The commission's report referred to states that "acute outbreaks of typhoid [at the Canadian Soo] must always be expected" from the use there of the polluted water. It also refers to the "continued excessive typhoid rate" of the American Soo, especially during the "navigation season"; although it would appear from the appendix that conditions at the American Soo have been so much improved that there is practically no typhoid during the winter. The report of the Michigan State Board of Health shows what appears to be an excessively high death rate at the American Soo from 1900 to 1913. These public reports should have been known to the steamer's management. In 1915 eight cases of typhoid at the American Soo were reported, one on June 4th. As opposed to these considerations are the facts that the water in question is not shown by actual analysis to have contained the typhoid germ, that other methods of infection (as by

flies, milk, and otherwise) are possible, and that the possibility of infection by other means than the water in question is not conclusively negatived. It must be conceded that the existence of the typhoid germ in the water taken from the river, and served on board the ship, is not proven beyond all possible doubt. But such degree of proof is not necessary. A preponderance of the evidence, a showing of greater probability, is all that is required (Marbury v. Railroad Co. [C. C. A. 6] 176 Fed. 9, 99 C. C. A. 483); and in our opinion the evidence preponderates in favor of the final conclusion of the court below, which, indeed, we should accept, unless at least the evidence clearly preponderates against it. Monongahela Co. v. Schinnerer (C. C. A. 6) 196 Fed. 375, 379, 117 C. C. A. 193; Cleveland v. Chisholm (C. C. A. 6) 90 Fed. 431, 434.[1] Indeed, there are several features which, taken together, persuasively point to that conclusion, including (a) the fact that so large a number of typhoid cases was shown to have developed on the South American; and (b) that, so far as appears, there were no typhoid cases among the passengers on the North American (a sister ship of the South American), which passed over the course at approximately the same time, but which did not take water from the Soo river—a consideration which we think not nullified by the fact that the North American's passengers were largely from Western Michigan ports, while libelants in large part took the steamer at Detroit, where typhoid is generally more or less endemic, as is usually the case in large cities.

We think the otherwise reasonable probability that the water in question contained typhoid germs in dangerous quantities is not overcome by the facts that the American Soo has had no epidemic of typhoid in recent years, and that the typhoid case of June 4, 1915, is not shown to have caused the infection here in question. A conclusion based on such facts would overlook not only the continuing deposit of sewage from the Canadian Soo, the danger from lake boats during the navigation season, the fact that a considerable number of typhoid patients remain "typhoid carriers" (and thus not improbably there were several at the American Soo, which continued to discharge its sewage into the river) for a long period of time after apparent recovery from the disease (and so no longer reported as having it), meanwhile expelling the typhoid germs through the excreta; it being assumed by competent authorities that at least 50 per cent. of all cases of typhoid infection are due to typhoid carriers. There seems no good reason for expecting the 1915 sewage deposit at the place in question to differ materially in amount from that found in 1913, or for believing that its dangerous character had been eliminated.

[4] 2. Passing for the present the case of Mallotte, who had arthritis, and the cases of Moore, Hudson, and Kay, whose fevers were complicated with other conditions, we have no difficulty in affirming the conclusion of the District Court that the serious illness of each of the other seven libelants after leaving the boat was due to contaminated

---

[1] So far as seems material to the case as presented here, the testimony previous to the accounting was taken in open court, that before the master commissioner being likewise so taken.

water drunk on the boat; and that in the case of all of these seven, unless it may be Town, whose disease was found by the District Court to be an intestinal affection, each suffered from typhoid fever or a fever of a similar nature. In the case of nearly all of the eleven libelants there is express testimony that they drank the water in question; in the case of none of them does the evidence exclude such probability. Each of the seven libelants referred to was attended throughout his illness by a reputable local physician, and in each case (still qualifying as to Town) the disease was pronounced unquestionably typhoid, or of that nature, and treatment given accordingly. We must reject the respondent's contention that the testimony of these physicians is unreliable because based only upon clinical symptoms. Until a comparatively recent period all diagnosis of typhoid fever has rested entirely upon clinical symptoms. Probably no continuous fever is better known to the medical profession generally. As is well known, it is essentially a disease of the intestine, usually marked by certain characteristic symptoms more or less clearly defined, including red spots on the abdomen, a long continued fever (with what is called a "step-ladder" temperature), which increases generally from day to day during the first two weeks or so, until the climax is reached (the forenoon temperature being lower than the afternoon), after which the temperature usually decreases from day to day for another two weeks or so. It is accompanied by derangement of the bowels, including ulceration of the intestine. In recent years the medical profession has, to a greater or less extent, made use of three laboratory tests, tending toward a more nearly absolute diagnosis. These are (a) a count of the white blood cells, (b) the Widal or agglutination test, and (c) the blood-culture test. These tests are confirmatory, and are especially valuable where the clinical typhoid symptoms are not strongly and characteristically marked. The Widal test is the one more commonly used; and the more prominent criticism is that in the cases before us it either was not employed, or, if employed, usually did not make a positive showing. But it is generally conceded that a negative response to the Widal test is not inconsistent with the existence of typhoid. The most we would be justified in concluding from this record is that, in the absence of confirmation by such laboratory tests, a clinical diagnosis of typhoid fever is not absolutely conclusive. But the rules of evidence in cases of this nature do not require absolute scientific certainty; and we think the testimony of the attending physicians establishes, by a fair preponderance of the evidence, the existence of typhoid or similar fevers. The record does not convince us that able and successful physicians, familiar with typhoid fever, are very likely to mistakenly diagnose and successfully treat other diseases as typhoid or paratyphoid. It is true that, in the case of each of several of the libelants, expert medical witnesses of high standing have expressed the opinion that, upon the hypotheses contained in the question submitted to them, the patient was not suffering from typhoid fever, but this, at most, raised only a question of fact; and in several of the cases the accepted hypotheses either did not accord with the weight of the evidence or contained elements either disputed or nonexisting.

We cannot accept respondent's contention that the fevers clearly developed either too soon or too late to connect them with the water-drinking on board the ship. The length of the period of incubation, or the time elapsing between the entrance of the germ into the alimentary canal and the first symptoms of the disease, is variously given by medical witnesses. Some place it as low as 6 to 10 days, one as from 7 to 21 days. One witness for respondent says that if the patient takes a very diluted solution the incubation period may be as long as 30 days. There is other testimony all the way between these extremes, although perhaps the consensus would make the more usual average somewhere around 10 to 14 days. The first, or prodromal, symptoms, which consist generally of a "below-par" or "run-down" feeling, frequently accompanied by headache, backache, and more or less fever, continue usually several days, sometimes 10 days or more, before the patient feels ill enough to go to bed. Sometimes a patient is up and about even longer. In the case of Elizabeth Campbell (for some reason not reported as typhoid) a physician seems to have been called about June 23d or 24th. In her case there was a positive Widal test before June 28th. A physician was called for Dorothy Ballard on June 27th. She then had a temperature of over 103. Her case was pronounced a typical case of typhoid fever. Lawrence, about June 28th, consulted the same physician who treated Elizabeth Campbell. He then had no fever. On June 30th he had a fever of about 100. On July 2d the Widal test was negative. The doctor diagnosed his case as either typhoid or paratyphoid, and gave him an antityphoid treatment, using a typhoid vaccine, whose results were very marked. Robinson called a physician on July 3d. He then had a temperature of 102, and had apparently been ill for 10 to 14 days. His clinical symptoms were typically typhoid, although the two Widal tests were negative. Town consulted a physician on June 14th. He was then suffering from infection of the bowels, and was confined to bed from July 9th to August 4th, after which he suffered a relapse, and was again confined to bed from August 17th to August 31st, thereafter receiving office treatment until September 18th, during all of which period he carried a fever of from one to four degrees. His attending physician regarded his illness as following an attack of ptomaine poisoning. There seem to have been typhoid symptoms, although not as typical as in the case of the Woodfields, soon to be mentioned. As the court and master both characterized Town's ailment as an "intestinal affection," and as the attending physician so called it, it is unnecessary to go farther. In the opinion of his attending physician the typhoid or paratyphoid condition overlapped the original intestinal affection. That such complaint could well have been caused by drinking contaminated water or eating diseased food is well within the testimony.

The cases of Madeline and Marion Woodfield were the latest to develop. A physician (the same who attended Town) was called July 17th. Each patient then had a high fever and had apparently been ill two weeks. The cases were reported as typhoid on July 21st, the treatment continued until August 17th, and the cases were regarded and

treated by the attending physician as typically typhoid. We see no occasion to question the conclusion of the District Court that these cases also resulted from the drinking of contaminated water on the South American.

[5] 3. *The Case of Mallotte.* It is not claimed that Mallotte had typhoid fever. The claim is that he had arthritis, resulting from an intestinal infection from drinking the impure water following a probable disturbance caused by bad food.

There was evidence tending to show that he drank the polluted river water and that he ate some of the tainted food. While on the boat he was attacked with dysentery, accompanied by headache and other pains. He was so ill that he was taken by train from Houghton to Detroit, where he lived. On June 11th he consulted his family physician, who testifies that he then had evidences of internal infection. He continued to take office treatment until June 23d or 24th, when he was put to bed, and on July 5th was taken to Grace Hospital, where he remained until July 26th. He had a severe and painful illness, accompanied by inflammation of the joints, together with endocarditis and pericarditis, which latter affections did not entirely leave until about March, 1916. His attending physician diagnosed the case as arthritis, resulting from an intestinal affection due to something taken into the alimentary canal through the mouth; the physician testifying that in his opinion this infection could have been caused by drinking the impure water. There is testimony sustaining an inference that the bacillus coli introduced into the system in sufficient quantities might cause an infection capable of invading the joints.

It is respondent's theory here, as indicated by quotation from the testimony of one of its medical experts, that Mallotte doubtless had arthritis or articular rheumatism, and that this condition was actually due to an intestinal infection resulting from the boat trip; but that it was not due to drinking polluted water (or, inferably, to anything taken at the time into the system through the mouth), but to a "faulty elimination," or so-called autointoxication, resulting from change of climate, environment, and temperature, which dammed up the poisons in his system (more particularly, according to the testimony of one of respondent's medical experts, in the tonsils, throat, teeth, and sinuses of the head), causing dysentery, headache, backache, and finally arthritis. That the infection which caused the arthritis or articular rheumatism was also responsible for the heart affections is not challenged. The record thus presents merely a case of conflicting medical theory, as to just how the intestinal infection was caused. If the judgment of the attending physician is accepted, the conclusion of the master and judge should be sustained. As opposed to this, there is testimony that germs taken by the patient, while on the boat, directly into the alimentary canal through the mouth, could not have caused Mallotte's arthritis. This may be entirely true; but the testimony to this effect is by no means convincing. On the other hand, there is, besides the testimony of the attending physician already alluded to, the undisputed and undiscredited testimony of libelant, who was but 43 years old when he took the boat trip in question, that he had never before

259 F.—32

had rheumatism nor any disease of the joints, nor grippe, nor colds, nor trouble of the tonsils, nor attacks of diarrhea, nor any disease that he knew of except typhoid fever 24 or 25 years before; that for 20 years before the hearing he had had his teeth looked after three or four times a year; that he was never seasick, and that on the boat he was warmly and comfortably dressed. This condition of health, while not conclusive against respondent's theory of autointoxication, naturally tended against it. Consideration of the testimony convinces us that we would not be justified in holding that the master and judge should have followed respondent's theory and testimony rather than that of libelant, or that the evidence decidedly preponderates against the conclusion below that Mallotte's arthritis "might reasonably have been caused by the furnishing to said libelant of impure drinking water on said trip."

[6] 4. *The Case of Moore.* The illness of this libelant was complicated with an attack of gallstones. Respondent's special contention is that Moore did not have typhoid fever, that his illness was due entirely to gallstones, and that the latter were not caused by drinking contaminated water. A careful review of the evidence convinces us that we would not be justified in questioning the conclusion of the court below that Moore suffered from typhoid fever as the result of drinking the contaminated water on the ship, and that the gallstones were the direct and immediate result of the typhoid. There is express evidence that Moore drank the river water on the South American. After his return from the trip, and about June 27th, he consulted a physician, who prescribed for him on that day and on the day following. The physician was called to the house about July 4th, when Moore had taken to bed. His temperature about the 1st of July was 102 degrees. He was in bed four or five weeks. About 12 to 15 days after the fever began a consulting physician was called, who made a blood count, and pronounced the case "undoubtedly typhoid fever." The consulting physician did not appear as a witness, but the attending physician testified that "I didn't consider it necessary to have a Widal test made because I was so positive of my diagnosis without it. * * * There was no question about its being typhoid." It was so reported. The consulting physician found the gall bladder distended to several times its natural size, but advised against immediate operation on account of its danger in Moore's then condition. The distension was reduced by ice-packs. Moore's convalescence was slow, and after spending two or three months in attempts at recuperation he was stricken with an acute condition of the gall bladder, resulting in an operation on November 22d and the removal of a large number of gallstones. It appears that Moore had had two or perhaps three attacks of ptomaine poisoning before his trip on the South American, and that a month or so before that trip his physician, who was treating him for what is colloquially called "biliousness," suspected the possibility of gallstones, and accordingly had an X-ray taken, which disclosed no gallstones. The attending physician testified that "if they are genuine gallstones they would be detected by the X-ray." The medical testimony is to the effect that gallstones are caused by clogging of the duct

reaching from the gall bladder to the intestine, and that such clogging, and the consequent formation of calculi, may be caused by ptomaine poisoning or any one of several causes of infection, and that a patient may have gallstones for a long period of time without their presence being discovered. A medical witness for respondent testified that "the typhoid fever cannot produce the gallstones"; but there is abundant evidence to the contrary. Indeed, the head of the Department of Medicine at Providence Hospital, Detroit, who, after examining Moore, advised the operation, testified that "one of the very common causes of gall bladder diseases and associated gallstones is typhoid"; also that the time which elapsed between the latter part of June and November 22d was sufficient for the development of Moore's gallstones. It was evidently his opinion that the gallstones in question were of recent formation. The surgeon who performed the operation gave it as his opinion, from the medical history, that the typhoid fever caused gallstones; saying that the latter were of "the soft pulpatious type of gallstones that I should say had been short in their formation." The evidence clearly does not preponderate against, but strongly supports, the conclusions of the master and judge.

[7] 5. *The Case of Hudson.* About June 26th this libelant called a physician, who testified that the patient told him he had been ill about a week. The physician sent him to Harper Hospital, Detroit, on July 9th, where he remained until August 10th, being attended by the physician who sent him there. The master found that Hudson suffered from typhoid or paratyphoid fever. He also found that during a part of the time when libelant was in the hospital suffering from that fever he also suffered from an internal inflammatory ailment, which the master concluded was merely a local condition, the effect of which upon the typhoid or paratyphoid was negligible.

Respondent contends that Hudson did not have either typhoid or paratyphoid fever, and that his illness was due solely to the inflammatory ailment mentioned. The attending physician testified that the disease was typhoid or paratyphoid, and that the inflammatory condition mentioned was a recurrence of a chronic affection of several years standing, for which he had treated Hudson "off and on for probably three or four months previous" to the typhoid or paratyphoid fever, and that the condition referred to was merely local. The hospital record introduced before the master showed conditions admittedly due to, and treatment obviously for, this inflammatory ailment. The record presents a sharply defined question of fact as to whether he also had typhoid or paratyphoid fever. On the one hand, the attending physician testified positively that he diagnosed it as typhoid or paratyphoid and has never varied his judgment. It was reported as typhoid on July 21, inferably at the instance of the attending physician. On the other hand, a hospital interne in charge of Hudson's case testified that the latter did not have typhoid fever and was not treated for it. A pathologist of that hospital gave his opinion, from an examination of the chart, that the patient did not have typhoid or paratyphoid and was apparently not treated therefor. This opinion was corroborated by two other expert witnesses, based upon an exam-

ination of the chart. At the hospital three Widal tests were made at the request of the attending physician, the last being made on July 20th. All were negative. An eminent physician called by libelant's attending physician as a consultant was not produced as a witness. The condition referred to did not appear in the testimony before the district judge.

Upon a careful consideration of the entire testimony, assuming that the attending physician believed he had a case of typhoid or paratyphoid, and giving due weight to the conclusion of the master and the district judge, we are unable to escape the conviction that the evidence clearly preponderates against the conclusion that libelant has sustained the burden of showing that he suffered from typhoid or paratyphoid fever due to water infection. We are thus bound to reverse the finding below. The Ariadne, 13 Wall. 475, 479, 20 L. Ed. 542; Western Transit Co. v. Davidson S. S. Co. (C. C. A. 6) 212 Fed. 696, 701, 129 C. C. A. 232, and cases cited.

[8] 6. *The Case of Kay.* There is testimony directly tending to show that this libelant drank the river water. On July 2d he consulted a physician, who pronounced his disease absolutely typhoid. His was the only case at Corunna. The physician, after stating Kay's symptoms on July 2d, gave the opinion that he had been in a condition requiring a physician's care for a week or ten days previously. An experienced nurse, who attended him after July 12th, pronounced the case clearly typhoid. The fever, which after July 12th seems to have run as high as 103, left him the last of July, pneumonia setting in, according to the testimony of the nurse (although the physician does not so state, but says Kay had bronchitis), on July 27th. The nurse in question seems to have practically ceased her attendance on July 31st by reason of her own illness. During Kay's illness a rectal abscess formed which was operated upon about July 26th (evidently the day before the pneumonia is said to have begun), Kay having been delirious on and several days before that date. It is undisputed that such an abscess could readily occur as a sequel to typhoid fever. There is, however, a large amount of expert medical testimony, in answer to hypothetical questions, to the effect that the abscess was not caused by the typhoid fever, but was itself sufficient to account for the clinical symptoms. This testimony, however, is apparently so largely based upon misapprehension of the entire history of Kay's illness (the chart introduced dated only from July 12th) as not to justify us, in view of the testimony of the attending physician and of the nurse, in disturbing the conclusion of the master commissioner and of the District Judge that Kay suffered from typhoid fever induced by drinking the contaminated water on the ship.

[9] 7. We are asked to reverse the conclusion of the District Court that libelants have not sustained the burden of proving that their illnesses on board ship were caused by eating tainted food. Respondent denies our jurisdiction to review that subject for the reason that libelants have not appealed. Before the creation of the Circuit Courts of Appeals it was the rule that on appeal in admiralty from the District Court to the Circuit Court the case was to be tried de

novo, without regard to whether appeal is taken by both parties or by only one. Irvine v. The Hesper, 122 U. S. 256, 266, 267, 7 Sup. Ct. 1177, 30 L. Ed. 1175. The act of February 16, 1875, 18 Stat. 315, c. 77 (Comp. St. §§ 1585, 1586), restricted review by the Supreme Court of the rulings of the Circuit Court to such as were excepted to at the time and presented by bill of exceptions, as in actions at law. There has been a conflict of decisions as to the practice of the Circuit Courts of Appeals in these respects. In Munson S. S. Line v. Miramar S. S. Co., 167 Fed. 960, 93 C. C. A. 360, on a review of the conflicting decisions, the Circuit Court of Appeals of the Second Circuit held that, on an appeal in admiralty from the District Court to the Circuit Court of Appeals, the whole case was open for trial de novo, and that the fact that one party did not appeal did not preclude the court from directing entry of decree favorable to him. In Reid v. American Ex. Co., 241 U. S. 544, 36 Sup. Ct. 712, 60 L. Ed. 1156, the Supreme Court, on review of the decision of the same Circuit Court of Appeals, in another case, held that the right to a trial de novo in the Court of Appeals still remained, under the authority of Irvine v. The Hesper, supra. The practice of the Circuit Court of Appeals for the Second Circuit as announced in Munson v. Miramar was sustained. We have treated the hearing of admiralty appeals in this court as of a de novo character. Western Transit Co. v. Davidson, supra, 212 Fed. at page 701, 129 C. C. A. 232. But we have not had occasion to determine whether a nonappealing party is entitled to a review of questions as to which he took no appeal. Whether the decision in Reid v. Express Co., supra, was intended to make the rule adopted by the Second Circuit applicable to the other circuits is not clear. But, assuming that libelants have the right to a review of the question stated, we are of opinion that the evidence does not clearly preponderate against the District Court's conclusion. We find it unnecessary to discuss the evidence in this regard, especially in view of the careful consideration given that subject by the District Judge.

[10] 8. *The Damages.* Except in the case of Dorothy Ballard and Elizabeth Campbell, the decree below awards in each case $1,500 for pain and suffering due to typhoid fever. Compensation for suffering is incapable of mathematical computation; it depends largely upon the judgment of the triers. Typhoid fever is, at the best, a serious disease. An award of $1,500 as actual compensation for pain and suffering is probably no more than would be given by either court or jury in a normal and individual case. The fact that several cases are involved in one proceeding can make no difference with the individual awards. We see no reason to disturb the judgment of the master and judge as to this feature of damages, or to think it was intended as punitive.

[11] *In the case of Moore* there was an additional award of $2,000 for past and future suffering on account of the gallstone trouble, as well as $1,545.69 for medical expense incident to the typhoid fever and gallstone trouble combined.

Both these awards are criticized as exorbitant, but we think they should be sustained. The record shows that following the removal of the gallstones Moore remained in the hospital three weeks, that the

wound never healed, that a drainage tube had to be inserted, and a second opening made, which again failed to heal. At the time of the hearing below, nearly two years after the operation, the wound was still open and discharging, requiring daily dressing, and, when it occasionally healed, to be reopened. It need scarcely be said that an open wound of that nature, doubtless due to infection of some kind, is a serious condition, and we cannot pronounce excessive an award of $2,000 therefor.

The medical expenses include doctor's bills of $436.50, hospital expense and nurses' bills aggregating $284.19, a trip to Northern Michigan to recuperate, under orders of the physician, costing $225, and the expenses of a trip South for the same purpose, amounting to about $600. The master found that these expenses were reasonable in amount, and were made necessary by the typhoid fever and gallstone trouble. These items are criticized as being allowed on the mere statement "of Mr. Moore that he had paid the same," but that there was no proof as to what the services consisted of, or whether they were necessary or the amounts reasonable. Moore produced direct proof of the actual payment of each of the claimed disbursements. The natural inference is that in the case of physicians, nurse, and hospital bills he paid the charges made. The entire history of the illness was before the master, who (as well as the judge) presumably had some knowledge of the reasonableness of such charges, especially in Detroit; and, in the absence of specific criticisms that the bills paid were exorbitant, we think the general objection urged should be disregarded.

[12] *As to business damages:* At the time of his illness, and until, and at the time of the hearing below, Moore was agent of a company in selling time recorders on a 23 per cent. commission basis, maintaining at his own expense an office at Detroit. He was awarded $7,500 for loss of his time and services to his business from the latter part of June, 1915, to the middle of December, 1915, and $3,500 for additional salaries paid to salesmen after his return to his business, made necessary by his inability to do his usual work. Nothing was allowed for impairment of future earning capacity, the master not being satisfied that future capacity was impaired. The brief of respondent's counsel does not criticize the award for additional salaries, and we think it not open to criticism. There was clear evidence that the salaries paid by Moore in 1915 and 1916 alone were $3,556.09 more than if on the 1914 basis. In 1917 the excess was greater than for 1915 and 1916 combined. The award for loss of time and services from June to December, 1915, is defended largely upon two propositions: (1) There is testimony that Moore's services were worth $15,000 a year, the district sales manager testifying that his company could afford to pay him that; and (2) that Moore had individually, from July 1, 1909, to July 1, 1910 (without employing salesmen) sold $87,000. Moore has apparently given the best detailed data available, which however, related only to the years 1914, 1915, and 1916, and the first eight months of 1917. Excluding, as seems fair for purposes of comparison, the "repair account" (both receipts and disbursements), it appears that in the calendar year 1914 (said to have been a very poor year) the gross com-

missions amounted to $6,838.47, the expenses to $2,744, leaving net profit $4,094.47. For 1915 the gross commissions were $17,898.24, expenses $3,832.97, net profits $14,065.27. (It is to be noted that the sales for the second half of 1915 were nearly double those for the first half.) For the year 1916 the gross commissions were $23,265.50, the expenses $5,372.12, net profits $17,893.38. For the first 8 months of 1917 gross commissions were $14,398.44, gross expenses $9,321.72, net profits $5,076.72; or, on a 12 months basis, $7,615.08. The salaries for 1917 (the year in which the United States entered the war) are so far in excess of those for the two preceding years as to suggest an increased proportionate expense, perhaps reflected in some measure in the fact that the office rent, which in 1914 and 1915 had been $384, and in 1916 $545, was in the eight months of 1917 $930. It thus appears that the net profits for 1915 and 1916 averaged something more than $15,000 per year, and that the gross commissions for the second half of 1915 were but $1,273.46 less than for the corresponding period of 1916, when sales seem to have reached the high-water mark. We therefore think that an award of more than $1,000 for loss of gross earnings for the approximately six months of 1915 in question would be merely conjectural. The award should be reduced accordingly.

[13] *In the case of Mallotte* the master allowed illness expenses totaling $721.40. Respondent's brief does not criticize this allowance except as to an item of $50 for drugs, which criticism we think without merit. This award should stand. The master also allowed $4,000 for pain and suffering, past and future. This item again is not criticized in counsel's brief, and we think it a reasonable allowance. Mallotte was not out of the house until Labor Day, and used crutches or a cane until December first. At the time of the hearing below he was still obliged to "watch his heart" and could not safely run. He still had frequent trouble with his knee. As to business damage: Libelant was a manufacturers' agent in the sale of automobile materials, maintaining an office, but without any sales assistants. His business was entirely personal, and depended upon direct solicitation. The master found that Mallotte's services were lost partially from June 11 to June 20, 1915, entirely from June 20th to September 15th, and that from the latter date to December 1st he was able to perform only a part thereof, and that the fair and reasonable value of his time and services lost was $7,000. We think this award should be sustained. The undisputed proof of damages is practically a mathematical demonstration. Commissions were received as the result of business placed the previous year. On this basis his commissions for 1913 were $13,679.27; for 1914, $9,944.35; for 1915 (business placed in 1914), $13,067.32; for 1916, $6,926.55 (this latter was practically the result of five months' work in 1915, previous to Mallotte's illness); for 1917 (business placed in 1916), $16,000. The details brought out by both direct and cross-examination fully established the propriety of accepting these figures as the basis of business damage. The award in this respect also should be confirmed.

*In the case of Town* the master allowed doctor's bill $25.50, drugs $22.50, value of 18 weeks' time and services as secretary of a lumber

corporation, and $1,500 for pain and suffering. The only allowance criticized is the item for drugs. The criticism is entirely without merit. Libelant testified, approximating from memory, that he paid "between $20 and $25." As stated, the master "split the difference." The award to Town should be confirmed.

[14] *In the case of Kay* there was awarded on account of physician's bill, hire and board of nurses, and extra maid for housework amounts totaling $366. We think the objections to these items are not well taken. There was also awarded for past pain and suffering $2,500, for future suffering $1,500, for loss of time and services in conducting a retail grocery business $40 a week for 15 weeks' total disability, and $20 per week for 20 weeks semi-total disability, these two items amounting to $1,000. For permanent impairment of earning capacity there was awarded the further sum of $2,500.

As to the allowances for pain and suffering and permanent impairment of earning capacity: Kay was confined to his bed from July 3d to September 15th (he was much of the time critically ill); he did not leave the house until a month later; he has not been entirely well since. He testifies that it was not until March, 1917, that he was able to run his business as before, although not then in his former health. He paid $676 for additional help at the store during his illness. At the time of the hearing below he had a blood pressure of 198. His personal efficiency was then estimated by him at about 50 per cent. of normal. He suffers from an impairment of memory as well as of physical strength. His physician thinks he ought to retire from business.

The difficulty lies in determining how much of this impairment and physical suffering is due solely to the typhoid fever and consequent illness. Kay was 53 years old when he made the trip. He testifies that he had had rheumatism off and on for three or four years. From July 22 to September 16, 1912, he was treated for articular rheumatism, involving both knees and both ankles. He was confined to the house a considerable time, and had to use crutches when he got out. He was treated by a physician for a cold in 1913; and in February, 1915 (four months before the trip), he was treated for "an attack of indigestion due to fermentation of food in the bowels." Kay says he had the grippe. The physician says there was good recovery from all the ailments he treated.

Kay had a retail grocery business with a stock of about $3,200. He was the sole proprietor. He attempted to give his annual sales. As construed by respondent's counsel, they appeared to range from $12,000 to $20,000 per year, on which he thought he earned a net profit of 10 per cent. Libelant's counsel construes the testimony as meaning that during his illness the lessened sales ranged between the figures stated. It is not clear which interpretation is correct. He permanently lost many customers, and his business had fallen off to a considerable extent at the time of the hearing. The estimate that his services to his business were worth $40 per week is more or less impaired by the facts (a) that before he was ill he was in the habit of drawing from the business but $15 a week, plus $8 to $10 worth of provisions, and there is

no evidence that his stock or the value of the business increased; (b) that while he promised to produce his books he for some reason failed to do so; and (c) that the highest salary he seems ever to have received was $35 per week, earned for less than a year managing the business of another, at a period of from 6 to 10 years before he made the boat trip, and when he was younger and presumably capable of earning better wages.

In this uncertain state of the record, we think justice will be more nearly done by reducing the aggregate allowances for pain and suffering, business loss, and permanent impairment of business capacity from the $7,500 allowed to $5,000.

*In the case of Elizabeth Campbell* there was awarded a gross total of $305.95, including the bills of three physicians amounting to $84, the bill of a nurse $165.50, board of nurse $42, drugs $14.45. It was stipulated that if the father were called as a witness he would testify that he had made the expenditure stated. The commissioner found that all were actually and necessarily incurred and were reasonable in amount. We see no occasion to disturb this award, in the absence of any cross-examination of the witness, or of any objection made to the items at the time the record was made, or of any testimony in dispute of the fact of payment (which seems to have been agreed to), or the reasonableness of the items. What we have said in the case of Moore seems pertinent here.

*In the case of Dorothy Ballard* the total award was $422, consisting of doctors' bills $117, nurse's compensation $200, nurse's board $40, drugs $40, and long distance calls, telegrams, and incidental expenses in connection with said illness $25. Here again there was no cross-examination, and, so far as we have seen, no critcism of the items before the master. What has been said with reference to the Elizabeth Campbell case applies generally here. The specific criticisms made in the Ballard case do not impress us as meritorious. This award also should be confirmed.

[15] *In the case of the Woodfield sisters* there was an award to each of $1,500 for pain and suffering, and $98.25 as one-half the expenses for physicians and nurses. The two were ill at home at the same time, and we see no objection to this division. In the case of one of them there is an allowance of $20 for the services of help in the home during the illness. Notwithstanding the conflict of authority, we think the fact that libelant's parents, or one or the other of them, paid the doctors' and nurse's bills and the charges of the woman who helped should not preclude recovery. Styles v. Decatur, 131 Mich. 443, 448, 91 N. W. 622; Wells v. Minneapolis Ass'n, 122 Minn. 327, 333, 142 N. W. 706, 46 L. R. A. (N. S.) 606, Ann. Cas. 1914D, 922; note to N. C. & St. L. Ry. v. Miller, 67 L. R. A. at pages 90, 91; 8 Ruling Case Law, p. 555. One of the sisters was allowed $75 for loss of earnings as a music teacher. We think this justifiable. The awards in both these cases should be affirmed.

[16] *In the case of Lawrence* there was an allowance of $1,500 for pain and suffering, $115.50 for medical services and cost of trip to recuperate, $400 for loss of eight weeks' time, at $50 per week, in the

conducting of a printing business which Lawrence owned and managed. None of these items is, in our opinion, subject to criticism, and none seem to call for discussion. There was also an allowance for six weeks' nursing by libelant's wife at $20 per week. We think an allowance proper under the authorities cited with reference to the Woodfield cases. The amount is criticized as excessive. The attending physician, on cross-examination, testified that had a nurse been employed an attendance of at least two weeks would have been required, and that the minimum charge for doing the sort of work which Mrs. Lawrence did would be $25 a week. Lawrence was in bed with typhoid four weeks, he spent some time on a trip to recuperate, and remained at home for a time after his return from the trip before returning to business. The master might well conclude that a patient ill in bed with typhoid fever required nursing, and there is no room for criticism of an allowance of four weeks' services at the rate allowed. We are disposed to yield to respondent's criticism as to the surplus of $40, in the absence of any testimony, called to our attention or found by us, indicating that more than four weeks' nursing was necessary.

[17] *In the case of Robinson* the master allowed payments for medical services and drugs totaling $216, plus $80 for four weeks' service of libelant's wife in nursing him. Aside from the general objection already passed upon herein, that no recovery can be had for the wife's services, the only definite criticism upon either of these items is that the proof of the amount paid for drugs was insufficient. We think the proof sufficient. Libelant testified that he kept no account of the payments, but thought they amounted to about $25. The award to libelant of $250 for two months' loss of business in soliciting life insurance, whose annual income averaged $1,500, was amply justified. There was an award of $2,000 for pain and suffering and an alleged serious permanent physical impairment. There was substantial evidence of such impairment. The master apparently took into account libelant's advanced age, and made what would seem a conservative allowance, which amounts to but $500 beyond the usual allowance for pain and suffering. The awards in this case should be confirmed.

9. In the case of several of the libelants we are asked to increase the allowance of damages made by the court below. Upon this subject we think it enough to say that, assuming that we have power to do so (referring to the discussion in the seventh paragraph of this opinion), we are not convinced that the evidence preponderates in favor of higher awards than made by the master and District Judge.

[18] 10. *Interest.* The interlocutory decree and order of reference was dated June 28, 1917; the master's report was dated May 25, 1918. The final decree allowed interest on the various awards from the last-named date; exception to the report, for the reason that interest should have run from the date of the interlocutory decree, being overruled by the District Judge. We think this action should not be disturbed, notwithstanding the master's supplemental report states that the damages found were fixed as of the date of the interlocutory decree. The allowance generally in the federal courts of interest on damages is not an absolute right. The general practice in admiralty is to allow in-

terest from the date of the filing of the commissioner's report (Gt. Lakes Towing Co. v. Kelley Island L. & T. Co. [C. C. A. 6] 176 Fed. 492, 498, 100 C. C. A. 108), but the question of its allowance, including the period from which it shall run, rests largely in the discretion of the court which passes upon the subject (The Scotland, 118 U. S. 518, 6 Sup. Ct. 1174, 30 L. Ed. 153); and this discretion will not be reviewed unless it has been palpably abused (Gt. Lakes Towing Co. v. Kelley Island Co., supra). On this subject the District Judge said:

"I have carefully considered the findings of the commissioner on the subject of damages and fully agree therewith. No undue delay ensued between the date of the interlocutory decree and the time of the hearing before the commissioner or of the filing of his report; it does not appear that the wrongful acts of the respondent were deliberate or willful; nor does any other reason for the allowance of interest upon the damages appear. Therefore no such interest will be allowed prior to the filing of the commissioner's report."

It surely cannot be said that the discretion vested in the court below has been palpably abused, and the action had upon that subject should not be disturbed. We find nothing to the contrary of this conclusion in the decision of this court in Thompson Towing, etc., Ass'n v. McGregor, 207 Fed. 209, 221, 124 C. C. A. 479. That case involved considerations not present here, viz. the application of the rule as to interest adopted by the state under whose statute damages for wrongful death are recovered in the court of admiralty.

It results from these views that the decree of the District Court should be sustained except in the respects in which a contrary conclusion is announced herein, and that for reasons specially stated herein the decree should be reversed and the record remanded to the District Court, with directions to enter a decree in accordance with this opinion.

The appellees other than Hudson, Moore, and Kay will recover their costs of this court. The appellant will recover against the three libelants last named each one-eleventh of its costs of this court.