J. W. DILLER, ADMINISTRATOR, APPELLANT, V. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPELLEE.

FILED MARCH 28, 1930. No. 27013.

*Bartos & Placek,* for appellant.

*Byron Clark, Jesse L. Root, Robert R. Hastings* and *J. W. Weingarten, contra.*

Heard before GOSS, C. J., ROSE, GOOD, THOMPSON, EBERLY and DAY, JJ., and LANDIS, DISTRICT JUDGE.

EBERLY, J.

This is an action to recover damages under the terms of the federal employers' liability act providing: "Every common carrier by railroad while engaging in commerce between any of the several states * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." 35 U. S. St. at Large, ch. 149, sec. 1, p. 65. At the conclusion of the evidence in the trial court and after both parties had rested, upon motion of the defendant, the jury were instructed to return a verdict for the defendant, and the action was thereupon dismissed. The plaintiff appealed.

The plaintiff's action was necessarily based upon the alleged negligence of the defendant, and as to which the averments of his petition were substantially that the plaintiff's intestate, Samuel Diller, at and prior to the time of contracting the disease causing his death, was the station agent for the defendant, and as such was in charge of the defendant's depot and business at Wilbur, Nebraska; and, with his employer, was engaged in interstate commerce at that point; that the defendant negligently failed to keep and maintain this depot as a reasonably safe place to work, but permitted the same to become in such condition that, due to the flooding thereof, the defective plumbing therein, and the lack of screens at the doors and windows thereof, it was rendered dangerous and exposed the plaintiff's in-

testate, while working, to infection due to the collection and propagation therein of germs causing typhoid fever. These allegations were denied by the defendant, and the evidence on the trial was conflicting on practically all of the issues of fact tendered by plaintiff..

However, in view of the action of the trial court, we are required to accept, for the purposes of this case, the evidence in the record supporting the plaintiff's case as true; and the action of the trial court in this case may be sustained only if the evidence in the record is not sufficient to sustain a verdict for the plaintiff. *Ogden v. Sovereign Camp, W. O. W.,* 84 Neb. 666; *Waxham v. Fink,* 86 Neb. 180; *Meek Co. v. Rohlff,* 91 Neb. 298. Also, in reviewing this cause we are required to assume the existence of every material fact which the evidence on behalf of the plaintiff establishes or tends to prove and give him the benefit of all proper inferences from such facts. *Central Nat. Bank v. Ericson,* 92 Neb. 396.

It is also true that for the sake of uniformity the decisions of the supreme court of the United States should and must control in determining the issue of negligence where the employers' liability act governs. *Kansas City W. R. Co. v. McAdow,* 240 U. S. 51. And in this court: "The federal court interpretation of the federal employers' liability act must prevail over any state law or rule of interpretation of a state court." *Preble v. Union Stock Yards Co.,* 110 Neb. 383. It seems that the federal courts have so construed this act that there is no liability thereunder without proof of the negligence of the defendant which was the proximate cause of the injury complained of. *Nanfito v. Chicago, B. & Q. R. Co.,* 103 Neb. 577. It was incumbent on plaintiff before such recovery could be had to allege and prove, not only the cause which operated to produce the death, but also that said cause had its origin in some specific and particular negligent act of the defendant, for the result of which it was legally liable. *Missouri, K. & T. R. Co. v. Foreman,* 174 Fed. 377; *Seabord Air Line Railway v. Horton,* 233 U. S. 492; *Toledo, St. L. & W. R. Co. v.*

*Allen,* 276 U. S. 165; *New York Central R. Co. v. Ambrose,* 50 Sup. Ct. Rep. 198.

For the purposes of this review, it stands as though admitted that plaintiff's intestate had been in the employ of the defendant railroad company for some 40 years at the time of his death; that he came to Wilbur as the station agent of the defendant at that place in 1907, and thereafter continued in that employment, and, while he owned his own home, he continually worked at the depot. The depot was a frame structure, one large room, the north room, on solid ground, with tile floor, the south room, on solid foundation and brick floor; the office, baggage room, or express room, was in the center and rested on brick piers with a hollow space underneath the floor; there was a meter pit under the office beneath the ladies' toilet; that the premises gave evidence of the fact that they were infested with rats. In a corner of the office was located the ladies' toilet and a toilet for men, which were built back to back, and toilet connections for both went into the corner of the meter pit and from thence out under the track and across the right of way to the city sewer system. The toilets had a lead connection between the toilets proper and a cast-iron soil pipe. The soil pipe to which connection was thus made ran out under the depot and conveyed the sewage to, and through, a clay tile pipe to the city sewer system. From 1925 to July 24, 1927, these toilets leaked into the meter pit. The contents of the toilets leaked out of the lead connections, and consisted of water, urine and feces. During this time there was considerable trouble with water coming back under the water pipe, which never could be traced to a water leak. This water varied from a clear to stinking water and a slimy mush, which came from a broken sewer pipe on the west side of the depot and smelled like urine and sewage and sometimes was a foot deep. This meter pit was about four by six feet. Its sides were made of brick with mortar joints. There were cracks in the east and southeast corner of the pit wall. This was located directly under the office and varied from a minute crack to about

an inch in width; it was widest about the center and extended the whole length of the wall. The water and refuse, after reaching this pit from the toilets and the sewer, oozed through that crack and went under the office. There always were stenches under the office, smelling like sewage and stagnant water. The plaintiff also alleges that the drainage of Third street and the alley between Third and Fourth streets, during seasons of extraordinary rains, followed the street to the vicinity opposite the depot, and from thence over the curb, across the tracks, over against the west side of the depot, through the rat holes there located, and found its way under the depot; and it was also alleged by plaintiff that these floods carried, with other refuse, typhoid fever germs; that there were several old privies in the alley referred to which were not covered up, and that big crowds attended a dance hall at the head of the alley, and that these people used the privies for stool and urine purposes; that this fecal matter was infected with typhoid germs and was thus carried by the floods to and under the depot in question; that commencing in 1925 and continuing thereafter the deceased had his lunch in the depot; and it is said in the evidence that the deceased never visited around but spent his time in the depot and his home, and the source from which his food was obtained is attempted to be shown.

The deceased began showing symptoms of sickness as early as the first of July, 1927. It clearly appears from the plaintiff's evidence that after that date and continuing to the 24th of July, 1927, he was scarcely able to go back and forth from his work. He experienced loss of appetite, backache, headache, got weaker, had nose bleed, and was troubled with diarrhea. On July 24 he felt compelled to relinquish his work and was placed in bed. In the opinion of all his doctors he was then suffering from a well-developed case of typhoid fever. He was thereafter removed from his home to the hospital at Grand Island, and after some time returned to his home, where he died on the 10th day of August, 1928, having never recovered from the illness which commenced on or about the 1st day of July, 1927.

It is well said in plaintiff's brief that this is purely and simply a question of fact. From the very nature of the case it is necessary that the proof must be circumstantial and that direct and positive evidence is not available. Typhoid fever is communicated only by taking the germs into the human system. Plaintiff's intestate was stricken with this disease about July 1, 1927, and his illness lasted for over a year. But we are unable to accept plaintiff's conclusion that the facts shown in his evidence establish a right of recovery against the defendant. We find nothing in the evidence supporting any inference further than that the plaintiff's intestate contracted the disease during the time he was employed by the defendant in its depot at Wilbur. Whether the infection occurred upon the street as he was passing to and from the place of employment to his home, or in the depot, or whether it occurred as the result of a possible contact with a typhoid carrier during the course of his business for his principal, we have nothing upon which any positive inference can be based. He had been employed at the same place for more than 20 years. No case of typhoid fever had occurred in Wilbur or vicinity since 1913. So far as the record discloses none of the patrons of the depot, and none of his neighbors, ever developed this disease. That the conditions disclosed by the evidence of plaintiff were unsanitary is true, but if we are to accept plaintiff's theory there were also other unsanitary conditions to be found in the nearby open privies and the use to which the alley referred to was devoted; not only were these unsanitary, but according to plaintiff's allegations were actually infested with typhoid fever germs. There is nothing in the evidence which even, as a matter of probability, discloses when, where, or how the actual contact between plaintiff's intestate and the germs of the disease from which he died actually took place. It is to be remembered that unsanitary conditions promote the spread of, but cannot originate, typhoid fever. The germs must be introduced by man and are so introduced. The man who first brings infection to a community may have the fever and not know

what is the matter. He may be recovering from it and still not know, or he may have had it and recovered long before but be a carrier and continue excreting bacilli for years. No typhoid fever existed at Wilbur or was developed among the patrons of this depot either before, during, or after the commencement of the decedent's illness. Indeed, his appears to be the only case of this disease that can be developed in, or was in manner traceable to, this structure. No investigation was made of the depot and surroundings until about the first day of August, 1927. On that date samples of water were taken at the house, depot, and elsewhere. These were all shown to be negative. On August 14 samples of water and mud were taken from the meter pit and from under the depot and delivered for analysis. About two months later additional samples were taken from the meter pit. Still later further samples were taken and on or about the 18th of March, 1928, certain witnesses who testified went to the premises in company with each other and procured samples. It is true that all of these specimens taken on and after August 14, according to these witnesses, disclosed the presence of typhoid fever germs. But in this connection it is to be remembered that from and after the first days of July to July 24, 1927, the evidence in the record fairly reflects the fact that the deceased, though continuing his regular employment in the depot, was a sick man and suffering from the effects of typhoid fever. The natural method of dissemination of this disease is practically agreed to by the experts of both parties to this litigation. From the record before us it is a fair inference that during this period between the first of July, 1927, and the 24th day of July, in the same year, Diller was excreting typhoid fever germs. During that time he suffered from attacks of diarrhea. The use of the toilets in the office, under such circumstances, by him was inevitable. If plaintiff's witnesses are correct as to their leaky condition and defective plumbing, and plaintiff's theory of the distribution of disease germs from toilets to meter pit and from thence over the ground under the depot is to be accepted, it is fair-

ly inferable that this sick man, thus excreting typhoid bacilli in feces and urine, contributed to the filth that found its way into the meter pit and from thence through the crack in the meter pit wall to the ground under the office, and from thence by rats, mice, flies, and other vermin to various parts of the premises, the results of plaintiff's discoveries made after August 1, 1927, are fully accounted for. At least this source of infection, thus clearly established, precludes an affirmative inference that the infected condition existed at and prior to the time plaintiff's intestate contracted the disease that caused his death.

The result thus reached is in strict accord with the facts testified to by plaintiff's witnesses and is not at variance with what may be termed common knowledge of this disease.

Thus, the findings of the Reed board, which was composed of the medical officers of the army, who at the close of the Spanish American War of 1898 made an extended study of the causes of a typhoid epidemic which the troops of that war suffered and which was published to the nation at large, thus becoming common property, determined as a matter of fact that a man (in a military camp) infected with typhoid fever might have scattered the infection in every latrene in the regiment to which he belonged before the disease was recognized in himself.

And again in 1908 an epidemic of 410 cases of typhoid fever occurred in the suburbs of Boston. The infection was traced to a milk dealer who continued his work for a period of two weeks after the onset of typhoid fever of which he later died. These are not cited as determinative precedents, but only illustrative of the deductions made from the testimony actually appearing in this record.

The conclusion is that, as to the depot occupied by Diller engaged in his employment during the three weeks or more while he was a sick man suffering from typhoid fever, the mere existence of typhoid fever germs in any part of the premises so occupied and used and under the depot to which such germs might have been carried by way of the meter

pit affords no evidence that this infected condition obtained prior to Diller's sickness, or that Diller's sickness was in any manner caused thereby.

The plaintiff in this case relied wholly upon circumstantial evidence to sustain his case. To justify recovery under the federal rule, it is required that the evidence introduced establish as a fact that the negligence of the defendant was the proximate cause of the injury complained of. Wherein circumstantial evidence alone is relied upon to furnish the necessary proof, the federal rule appears to be: "Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves presumed. * * * 'In the first place, as the very foundation of indirect evidence is the establishment of one or more facts from which the inference is sought to be made, the law requires that the latter should be established by direct evidence, as if they were the very facts in issue.' * * * The law requires an open, visible connection between the principal and evidentiary facts and the deductions from them, and does not permit a decision to be made on remote inferences. * * * A presumption which the jury is to make is not a circumstance in proof; and it is not, therefore, a legitimate foundation for a presumption. There is no open and visible connection between the fact out of which the first presumption arises and the fact sought to be established by the dependent presumption." *United States v. Ross*, 92 U. S. 281. See *Manning v. Insurance Company*, 100 U. S. 693, 698; *Chicago, M. & St. P. R. Co. v. Coogan*, 271 U. S. 472, 477; *New York Central R. Co. v. Ambrose*, 50 Sup. Ct. Rep. 198.

It follows therefore that the action of the trial court in directing a verdict against the plaintiff is sustained by the record; and the judgment is

AFFIRMED.