## GOODRICH v. UNITED STATES et al.

District Court, S. D. New York.
Oct. 18, 1932.

Simone N. Gazan, of New York City, for libelant.

George Z. Medalie, U. S. Atty., of New York City (John C. Donovan, of New York City, of counsel), for respondents.

PATTERSON, District Judge.

The libelant's intestate, Goodrich, was employed as a water tender on the steamship Davenport, owned by the United States. He signed on at New Orleans on May 7, 1928, for a voyage to Rotterdam and Hamburg. The Davenport left on May 14, 1928. Three days later two men came down sick with what proved later to be typhoid fever. Goodrich was taken ill on the 24th, but apparently recovered for the time being. In all six or seven men out of the crew of thirty-eight seem to have contracted the fever. Goodrich succumbed to it again while the vessel was between Rotterdam and Hamburg. On arrival at Hamburg about June 11th, he was sent to a hospital, where he died on June 28th. This suit is brought by his administrator, under the provisions of 46 USCA §§ 688 and 742. It is alleged that his death was the result of the negligence of the ship's officers, both in tolerating conditions which exposed him to the disease and in failing to give him proper attention after he had contracted it. The contention is that the typhoid fever came from the drinking water on the Davenport.

In behalf of the libelant several seamen who were on the voyage testified that the drinking water on the Davenport was muddy and dirty; that it had the taste and appearance of river water; that it came from the forepeak tank which was in a very dirty condition. I cannot credit any of this testimony. The proof is that the water for drinking was kept in domestic tanks which were on the shelter deck. From these tanks there were two outlets, one in the galley for cooking purposes, the other at the scuttle butt where all on board got their drinking water. The forepeak and afterpeak tanks and the other tanks held water for the boilers, for washing, and for other nondrinking uses; there was no connection between them and the drinking water system. The condition of the peak tanks therefore is of minor importance in the case; it may be noted, however, that if the water in them had been as bad as described by the libelant's witnesses, the machinery of the steamer would have broken down. The drinking water used on this voyage and on the voyage preceding it had been purchased in part from the city of Hamburg, Germany, and in part from the city of New Orleans. It was of the same sort as that furnished by these cities to their inhabitants for drinking and was supposed to be pure and potable. The idea of some of the libelant's witnesses, that the ship's officers had filled up the domestic tanks with water from the Mississippi river, must be put down as merely the product of their imagination. So, too, as to the messboy taking water from the afterpeak tank and making coffee with it.

On arrival at Rotterdam the master sent a sample of the drinking water to the hospital for analysis. From the fact that he got no report of the result, he assumed that the water was found to be all right. On the ship's return to New Orleans in July, the water was tested, no trace of the typhoid bacillus being found. This analysis at New Orleans may have been too late to indicate with certainty that the drinking water in May had not harbored the bacilli. As for the care taken of the domestic tanks, it was shown that they had been thoroughly cleaned in November, 1926, and had been examined on every voyage since. They had not been cleaned again because no dirt was ever found in them. The drinking water in taste and appearance was always good.

The respondent also showed that the food supplied on the Davenport had been pur-

chased from reputable dealers and was or should have been wholesome, that the quarters were kept reasonably clean, and that the crew had undergone a medical examination before the commencement of the voyage.

Upon the foregoing facts, I am of opinion that the libel must be dismissed. To recover in a case of this type, the libelant must be able to point to some negligence as a result of which the deceased contracted typhoid fever. The mere fact that he got the disease while on the respondent's ship is not enough. Chicago, etc., Transit Co. v. Moore (C. C. A.) 259 F. 490, certiorari denied 251 U. S. 553, 40 S. Ct. 118, 64 L. Ed. 411; see, also, Canavan v. Mechanicville, 229 N. Y. 473, 128 N. E. 882, 13 A. L. R. 1123; Diller v. Chicago, etc., R. Co., 119 Neb. 494, 229 N. W. 888. From the fact that there was an epidemic of the fever among the crew, the inference is a strong one that they caught it on the ship rather than on shore; that the source of the infection was on the ship itself. But beyond this we get into speculation. The typhoid bacilli may have come on board in the water, in the food, in a carrier who later in some way contaminated the water or the food, or in some other manner. One guess is as good as another. The libelant has endeavored to fasten the guilt on the water. I think, however, that the matter is left wholly in the dark. In any event, whether the bacilli came from the water or not, no culpable negligence has been shown as to the water or in fact as to any other condition aboard. The water system was good in construction, and the drinking water itself was procured from reliable sources of supply. Complaint is made that the domestic tanks had not been cleaned out for over a year. But it was shown that they were frequently inspected and found always to be clean. There is nothing in the case indicative of a custom on vessels of this sort to scrub out the water tanks on every voyage, irrespective of whether they seem to need it or not. Nor is there proof that the crew entered the domestic tanks and tramped around in them. The case has no resemblance to the Chicago Transit Case; supra, or to Stubbs v. Rochester, 226 N. Y. 516, 124 N. E. 137, 5 A. L. R. 1396, in both of which the evidence pointed to the water as the probable seat of the trouble and pointed also to culpable negligence on the defendant's part.

It is insisted that the rule of res ipsa loquitur should be applied to the case. I am not sure that it should. It is questionable whether the breaking out of several cases of typhoid fever on a ship points to the probability of carelessness on the part of the ship's officers. But the rule does not change the result in this case. The evidence introduced by the respondent shows that the ship's officers used all the care reasonably to be expected of them and that the epidemic came about through no dereliction of theirs.

There was no proof in support of the charge that the deceased had not received proper treatment while down with the fever. The ship's officers seem to have done all that nonmedical persons could do for the relief of this man and the other sufferers.

The suit is maintained for the benefit of the deceased's parents. There was no evidence of actual contributions made by him to his parents during his lifetime, and the respondent insists that consequently there is no reasonable basis for an award to cover pecuniary loss. The City of Rome (D. C.) 48 F.(2d) 333. Under the Jones Act § 33 (46 USCA § 688), however, recovery may be had by the personal representative for the pain and suffering of a deceased seaman. Luckenbach S. S. Co. v. Campbell (C. C. A.) 8 F. (2d) 223; see St. Louis, etc., R. Co. v. Craft, 237 U. S. 648, 35 S. Ct. 704, 59 L. Ed. 1160. But these matters of damages need not be determined, since in my opinion the merits of the case are not with the libelant.

The libel will be dismissed.