## Case No. 8,085.

### The LARCH.

[2 Curt. 427.][1]

Circuit Court, D. Maine. Sept. Term, 1855.[2]

MARITIME LIENS — MASTER'S ADVANCES AND DISBURSEMENTS—PART OWNER'S LIEN—EQUITABLE LIENS IN ADMIRALTY.

1. The master has not a lien on the ship, for his advances and disbursements abroad.

[Cited in U. S. v. Thirty-Nine Thousand One Hundred & Fifty Cigars, Case No. 16,464. Followed in Bartlette v. The Viola, Id. 1,083. Disapproved in The Tangier, Id. 13,744.]

2. A part owner, though ship's husband, has not a lien on the share of his tenant in common for advances and disbursements.

[Cited in Topfer v. The Mary Zephyr, 2 Fed. 825; The J. C. Williams, 15 Fed. 559; White v. Two Hundred and Ninety-Two Thousand

---

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

[2] [Reversing Case No. 8,086.]

Three Hundred Dollars, 19 Fed. 848; The Jennie B. Gilkey, 20 Fed. 161; The Esteban de Antunano, 31 Fed. 923; The Daniel Kaine, 35 Fed. 787; China Mut. Ins. Co. v. Ward, 8 C. C. A. 229, 59 Fed. 714.]

3. If he had such a lien in equity, it would not enable a court of admiralty to take an account and enforce it.

[Cited in The J. A. Brown, Case No. 7,118; The Brothers, 7 Fed. 880; Pettit v. The Charles Hemje, Case No. 11,047a.; The John E. Mulford, 18 Fed. 457; The Ella J. Slaymaker, 28 Fed. 768; The H. E. Willard, 52 Fed. 388. Followed in The H. E. Willard, 53 Fed. 601.]

This was an appeal from a decree of the district court which established a lien on the brig Larch for expenditures made by the master and part owner. [Case No. 8,086.] The facts briefly were, that Haskell, being master and owner of one half of the brig, contracted, in the autumn of 1853, with his co-owner to take and employ her, on shares, in the business of freighting. From the autumn of 1853 the brig was variously employed and carried freight. In October, 1854, she sailed from Pictou with a cargo of coal, bound for Nantucket, got ashore and was found to be seriously injured by worms. Being incapable of carrying forward the cargo, it was discharged. The libellant was employed till December in getting the vessel off the shore and bringing her home. The libel was filed to recover the expenses of relieving and restoring the vessel, and included a great variety of claims for disbursements, as well as for the personal services and expenses of the libellant.

Mr. Butler, for appellant.

S. Fessenden, contra.

CURTIS, Circuit Justice. The libellant asserts a lien on this vessel for his disbursements in three capacities,—as master, as part owner and ship's husband, and as charterer.

First, as master. The question is, whether for disbursements made by the master abroad, he has a lien. It is definitely settled in England that he has not. In Smith v. Plummer, 1 Barn. & Ald. 575, the cases are reviewed, and the decision then made is considered to have fixed the law of that country. Atkinson v. Cotesworth, 3 Barn. & C. 647; Gibson v. Ingo, 6 Hare, 112; Abb. Shipp. 420. It is said by Chancellor Kent (3 Comm. 167) that the question is still a vexed and floating one in our own maritime law. The decisions made in the United States are: (1) That the master has not a lien on the ship for his wages. The Grand Turk [Case No. 5,683]; Fisher v. Willing, 8 Serg. & R. 118; The Orleans v. Phoebus, 11 Pet. [36 U. S.] 175; Willard v. Dorr [Case No. 17,679]; Phillips v. The Thomas Scattergood [Id. 11,106]. (2) That he has a lien on the freight for his disbursements. Lewis v. Hancock, 11 Mass. 72; Ingersoll v. Van Bokkelin, 7 Cow. 670, 5 Wend. 315. See, also, Lane v. Penniman, 4 Mass. 92; Shaw v. Gookin, 7 N. H. 19; Newhall v. Dunlap, 14 Me. 183. And in Drinkwater v.

The Spartan [Case No. 4,085], Judge Ware held that there was no sound distinction between wages and disbursements, and the master had a lien on the freight for both. (3) In Gardner v. The New Jersey [Id. 5,233], Judge Peters declared that a master who paid claims which were liens on the vessel, became substituted in place of the lien creditors, and acquired a lien on the vessel, even though paid in the home port. He says, in a note, the allowance to the master was not opposed. The allowance was out of remnants in the registry. It is to be observed that Judge Peters did not consider that the master had a lien in his own right, but only as succeeding to the privilege of creditors who had liens. With great respect for that eminent admiralty judge, I do not think such substitution can be maintained.

I am not aware that the general maritime law contains any particular rules or principles concerning substitution, unless we should except abandonments; and even these cannot be said to be independent of the laws of particular countries, for not only their forms and ceremonies, but the cases in which they may be made, are not alike everywhere. In general, I think it is true, that the question whether a substitution can be asserted without an actual assignment by the creditor, must depend in courts of admiralty upon the municipal law of the country. If, therefore, it could be maintained, that under the Roman law, a master who should pay a debt for which the vessel and owners were liable, would by the mere force of such payment be substituted in place of the creditor, and acquire his lien, it would not follow that the same substitution would be allowed by a court of admiralty. Substitution, though by a fiction of the Roman law it is worked out by allowing the person paying, to act as the attorney of the creditor (Pothier's Des Arrêts, etc., 66–68, note), is not a matter of remedy merely, nor does it arise from any law of procedure. It is an equitable right, which the law recognizes and gives effect to, and unless that equity law, which courts of admiralty administer, has recognized and defined this right, those courts have no power to allow it. To a certain extent, the right of substitution has been recognized and allowed in our equity law. But in one particular, and that decisive of this inquiry, it differs from the Roman law. By the latter, if a payment extinguished the debt and thus put an end to the security which the creditor held for its payment, there could be no substitution. D. 46, 3, 76. Otherwise, if the security was of such a nature as still to subsist after payment. And in order to prevent the operation of this principle, a fiction was introduced, according to which, in certain cases, the creditor was deemed to have sold his rights to the person paying, although in point of fact it was a true payment, and no such sale or assignment was made. Pothier's Des Arrêts, etc., 66–68, note; Domat, pt. 1, bk. 3, §

6, note 9 (Cushing's Ed. 1787, note). No such fiction exists in our law. And I consider it to be true, that when a payment by a surety or other·third person extinguishes a debt, and thereupon the lien or incumbrance ceases to exist, there can be no substitution. It is otherwise where the legal title still remains in the creditor, or where from any cause the security may still subsist. Copis v. Middleton, 1 Turn. & R. 224; Jones v. Davids, 4 Russ. 277; Hodgson v. Shaw, 3 Mylne & K. 183; Wiggin v. Dorr [Case No. 17,625]. The debt being extinguished, the lien is extinguished also, and no right remains to which the master can succeed.

A case is stated by Emerigon (2 Con. a la Grosse, c. 12, pp. 596, 597, § 3) against the right of a part owner who pays privileged claims, to succeed to the privilege of workmen or material men; and such is evidently his own opinion. In the case of The Packet [Case No. 10,654], Mr. Justice Story, in reasoning on the duty of the master to use his own funds rather·than borrow on bottomry, suggests a possibility, that the master in such a case would have a lien on the ship. But it is quite obvious, that learned judge did not there intend to express any opinion on the point, and he does not cite the leading cases which affect it. See 3 Kent, Comm. 168, note e.

The result of this examination of American authorities is, that it has never been decided in this country, that the master has a lien on the ship for his disbursements; and that the authorities bearing in that direction go no further than to assert his lien on the freight. How strong a bearing they have to show that he has also a lien on the ship, depends on the principles, or grounds of the lien which they establish, and their application to the ship as well as the freight. Now, the supreme court of Massachusetts in Lewis v. Hancock [11 Mass. 72], consider the right of the master, as against the owner, to collect the freight, and reimburse himself for advances, to be the same as that of a factor or consignee who has sold the merchandise of his principal, and has not yet received payment. And this seems to be adopted by the supreme court of New York, in Ingersoll v. Van Bokkelin [7 Cow. 670]. No other ground is stated in their opinion. This is intelligible, and may be sound; but it has no application to the vessel. It proceeds on the ground, that a promise has been made to an agent to pay him a sum of money on account of a consideration coming from him as agent; that his personal services, or advances, or both, have contributed to that consideration; and his principal cannot interpose and prevent the performance of that promise to the agent, to the injury of the agent.

In the court of errors, the chancellor in his opinion, declares that the lien on the freight is incident to the lien on the ship; and being met with the difficulty, that it is settled law that there is no lien on the ship for wages, he declares that there is also no lien on the freight for wages, because they are due by a personal contract with the owner, by which the master can well enough provide for his own security, without the aid of a lien. I concur in opinion with Judge Ware in Drinkwater v. The Spartan [supra], that this distinction is unsound. Indeed, if the lien on freight money is like the right of a factor, on what ground shall he exclude the compensation for the master's services, by the aid of which, that money is earned? And·as to the ability of the master to protect himself against the insolvency of the owner during his absence abroad, it is difficult to perceive how it is greater in case of wages, than disbursements; and it would seem from the passage of Act 7 & 8 Vict. c. 112, that experience had shown the practical necessity in England, of protecting wages rather than disbursements; since that act has enabled masters to sue in rem, for their wages, in case of the bankruptcy or insolvency of the owner.

To allow to a master a lien on the ship for his advances abroad, is not unattended with practical objections. It would put into·his hands the means of acting directly against the title and interest of his owner in distant ports, where the owner had no representative but himself. even to the extent of procuring a judicial sale of the vessel to satisfy those advances. And if the lien were a true common law lien, a right of detention, it would prevent the owner from displacing him abroad, however great his misconduct might be, without yielding to claims which could not be properly investigated there, or would occupy an inconvenient length of time in their investigation.

But I do not feel at liberty to go into such considerations on such a question, as I have had occasion repeatedly to declare. See The Kiersage [Case No. 7,762]. A lien being an exception to the general rule, which entitles all creditors to participate ·equally in all the property of their debtor, and a maritime lien being also a jus in re. which goes with the thing into the hands of purchasers and so is embarrassing to commerce. it is stricti juris; must be derived from some provision of positive or customary law, which clearly confers it in the case in judgment; and it cannot be made out by way of argument from analogy. nor from considerations of convenience. Such considerations are for the legislator alone. I am unable to find any rule, either of the common or maritime law of this country, creating such a lien. It is true, the maritime laws of the continental states, allow the master a privilege on the vessel, even for his wages. But the maritime law of England, from which we derive nearly all our own, has been much more sparing in the allowance of privileged liens, than the law of the continent. Though our maritime law is not necessarily identical with that of England, and has been modified in important particulars by our own usages, yet, so far as I know, not in this par-

ticular; and I know not on what ground I should be authorized to declare, that while, by the maritime law of England, the master has no lien on the ship for his wages or advances, by the maritime law of the United States, he has a lien for his advances, though not for his wages.

I desire to be understood, as not intending to question the correctness of the decisions, that the master has a right, as against the owner, to collect enough of the freight to reimburse himself for his advances. I express no opinion thereon. I do not think they have any just bearing on the question before me. An assumption that because he has this right, he also has a lien on the ship, is wholly inadmissible, in my judgment. The distinction between equitable rights to have the freight of a ship applied, to pay the expenses incurred in earning it, and a lien on the ship itself, is clear. The cases on this subject are collected and reviewed by the vice chancellor in Green v. Briggs, 6 Hare, 395.

The next question is whether the libellant had a lien as part owner and ship's husband. I do not propose to go into a critical examination of the cases, beginning with Doddington v. Hallet, 1 Ves. Sr. 497, where Lord Hardwicke held in favor of the lien, and Ex parte Harrison, 2 Rose, 76, and Ex parte Young, Id. 78, note, where Lord Eldon overruled Doddington v. Hallet. See, also, 2 Ves. & B. 242. That the latter decision is the law of England, I take to be clear. There has been some diversity of decision in this country; but I think it has proceeded from diversity in the views taken of the particular facts of the cases, rather than from any real difference in principles. That the owners of a vessel may be copartners in respect to that as well as any other property, and that when they are so, each has a lien, cannot be doubted. But where no such special relation exists, where they are merely part owners, and as such tenants in common, that one has no lien on the share of another for advances, I believe to be equally clear. And when this distinction is attended to, the diversity between the cases is much lessened, if it be not entirely removed. Nicoll v. Mumford, 4 Johns. Ch. 526, 20 Johns. 611; Patton v. The Randolph [Case No. 10,837]; Green v. Briggs, 6 Hare, 395; Lamb v. Durant, 12 Mass. 54; Merrill v. Bartlett, 6 Pick. 46; Braden v. Gardner, 4 Pick. 456; French v. Price, 24 Pick. 14; 3 Kent, Comm. 41; Story, Partn. 584. There is no ground for maintaining in this case that these persons were partners. As owners of the vessel merely they were not so. The agreement to run the vessel on shares, did not make them partners. Webb v. Pierce [Case No. 17,320], and cases there cited. Nor had the libellant any lien on the vessel as ship's husband. Ex parte Young, 2 Ves. & B. 242; Story, Partn. § 433.

There is another view of this subject which would be fatal to the jurisdiction of this court. If it were admitted that a part owner was in equity entitled to a lien on the vessel, for what should prove to be due to him on taking an account, it would not follow that a court of admiralty could take that account and enforce the lien. It is not one of those maritime liens which are peculiarly within the jurisdiction. See the case of The Young Mechanic [Case No. 18,180]. And a court of admiralty has not jurisdiction to take an account between part owners. See Kellum v. Emerson [Id. 7,669], and cases there cited. In this case, before it could be ascertained, what, if anything is due to the libellant, an account must be taken not only of his advances, but of the gross earnings of the vessel, and the charges and deductions therefrom under the contract to run the vessel on shares. In my opinion, the court has not jurisdiction to take such an account in order to enforce what is termed, in a court of chancery, a lien, but which is in truth merely an equity, worked out through a constructive trust which is a creature of that court. Some reliance was placed on the fact, that the libellant was in possession of the vessel. But I do not think the mere possession of one tenant in common can give him any rights adverse to his co-tenant. Ex parte Machell, 2 Ves. & B. 216, 1 Rose, 447. As charterer, merely, the libellant has no lien. Indeed, it has not been attempted by his counsel to maintain his claim on this ground, for he admits that before the expenses in question had been incurred, the vessel had become incapable of performing the service for which she was chartered, and that the advances ought not to be considered as made by the libellant in the character of charterer, but of master or part owner.

The decree of the district court is reversed, and the libel dismissed.