## THE KALFARLI.

(Circuit Court of Appeals, Second Circuit.    November 16, 1921.)

### No. 37.

1. **Maritime liens ⟜26—Are stricti juris.**

   A maritime lien, being a jus in re, which goes with the thing into the hands of purchasers, and so is embarrassing to commerce, is stricti juris.

2. **Maritime liens ⟜60—Right to proceed in rem must be pursued in admiralty.**

   The right of one making repairs or furnishing supplies to a vessel to proceed in rem against the vessel must be pursued in the admiralty courts, but the right to proceed in personam against the shipowner for money damages alone is within the concurrent jurisdiction of the common-law courts.

3. **Admiralty ⟜26—Not courts of equity, but proceed according to principles of equity.**

   Courts of admiralty are not courts of equity, but in respect to certain matters within their jurisdiction proceed according to the principles of equity.

4. **Maritime liens ⟜59—Admiralty cannot deny relief in rem for fraudulent conduct not defeating right at law.**

   A court of admiralty, though administering justice on equitable principles, cannot refuse to enforce a maritime lien for repairs or supplies because the lienor has fraudulently claimed to have done more work than he did, or fraudulently charged for the labor or supplies in fact furnished; such fraudulent conduct not extinguishing his right to proceed in a common-law court in personam.

5. **Admiralty ⟜118—Appellate court may examine testimony and reach its own conclusions on the facts.**

   While the decision of a trial court in admiralty on a question of fact based on conflicting testimony, or the credibility of witnesses examined before the judge, is entitled to great respect, and will not be lightly reversed on appeal, unless there is a decided preponderance of evidence against it, or a mistake is clearly shown, the whole case is open for trial de novo, and where the judge did not see and hear all of the witnesses, the appellate court may examine the testimony and reach its own conclusions.

6. **Shipping ⟜76—Duty of person contracting to make repairs to disclose that he was acting for himself, and not for another.**

   Where the master of a steamship, in employing libelant to make repairs, supposed he was dealing with a third person, for whom libelant had previously been foreman and solicitor, and the libelant knew the master thought so, it was his duty to disclose that he was no longer associated with such third person, but was acting for himself, and his omission to do so amounted to fraudulent deception.

---

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. Fraud ⊂═⇒16—May consist of silence.**

    Fraud may consist of silence as well as actual outspoken misrepresentation, and under some circumstances silence may be as reprehensible as false representations.

**8. Maritime liens ⊂═⇒65—Evidence held to show charges grossly inflated, and to require reduction of amount recovered.**

    In a suit to enforce a maritime lien for repairs on a vessel, evidence as to the prevailing rate of wages and the number of hours worked *held* to show that the libelant's charges were grossly inflated, and to require a reduction from $2,494.35, allowed by a commissioner and the trial judge, to $1,700.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by Anton Andersen against the steamship Kalfarli, her engines, etc., claimed by Daniel Steen. From a decree for libelant (263 Fed. 958), claimant appeals. Modified and affirmed.

Bullowa & Bullowa, of New York City (Lawrence E. Brown, of New York City, of counsel), for appellant.

Thomas J. Cuff, of New York City, for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This is a suit in admiralty, in which the libelant has filed his libel against the steamship Kalfarli to recover the sum of $3,626, which he alleges is the reasonable value of work, labor, and services which were necessary for equipping the vessel, and which he avers that he performed at the special instance and request of the master and owner of the vessel, between December 26, 1917, and January 5, 1918.

The answer denies the allegations of the libel, except the nonpayment of the amount demanded and the jurisdiction of the court, and alleges that the work was performed pursuant to a contract made between the respondent, as master of the vessel, and one Andrew Olsen, and that the contract was solicited by the libelant for and on behalf of Olsen, and further alleges that the reasonable value of the work, labor, and services rendered was but a fraction of the sum alleged in the libel.

Testimony for the libelant was taken in open court, and testimony for the claimant was taken out of court; the last of such testimony having been taken on November 8, 1918. The District Judge rendered an opinion on February 3, 1920. He found in favor of the libelant, but directed that the case be sent to a commissioner, "if further hearing is desired as to the amount." On February 18, 1920, an interlocutory decree and order of reference was filed and entered, and on April 20, 1920, the commissioner began to take testimony, and continued thereafter to do so from time to time until May 28, 1920, when it was declared that the testimony was closed.

On August 16, 1920, the commissioner filed his report. He reported in favor of the libelant in the sum of $2,160.05, having disallowed a number of items in his claim. The amount allowed, with interest thereon from January 5, 1918, which amounted to $334.30, made in all the

sum of $2,494.35. On August 19, 1920, the claimant filed his exceptions to the commissioner's report, and on September 9, 1920, the District Judge entered a decree, in which it was ordered that the report of the commissioner be in all things confirmed, and that the libelant recover the amount recommended by the commissioner, together with his costs, which amounted together to the sum of $2,690.85. In his opinion the District Judge said:

"There may have been some lack of understanding on the part of the master of the ship as to the capacity in which Andersen was undertaking to do the work, and perhaps Olsen was rightfully displeased with Andersen for obtaining work from his old customers, without making plain to them the change in relation and that the work would not be done by Olsen's men or at his shop. But neither of these propositions is a defense to an action for work actually performed by Andersen as principal, on the orders of the master, even though the master mistakenly closed his eyes, disregarded the statements and facts, and thought he was an agent.

"The claimant invokes the rule that the libelant must have clean hands and be guilty of no deception before he may come into equity for relief. But the present action is not in equity, but at law. Unless there was an absolute absence of contract, or of consent and acquiescence in the performance of the work on the ship, the ground of objection on the part of the third party as to business methods used in obtaining the work is not a defense to a charge for the work done. Even in equity the relation of third parties would not affect the equities between the libelant and the claimant, in an action on a lien for work and materials. The testimony produced upon the trial seemed to show in general that the work was well performed and that the amount of the bill, while large, due to increased wages and other causes, was not exorbitant or incorrect."

The statement that "the present action is not in equity, but at law," must have been made inadvertently. The District Judge very well knew that the suit was neither at law nor in equity, but in admiralty, and an admiralty court administers maritime law by a procedure peculiar to itself and different from that followed by either courts of common law or of equity. The admiralty courts owe their origin largely to the civil law, and the process and methods of procedure in such courts, as was pointed out in Richmond v. New Bedford Copper Co., 2 Lowell, 315, Fed. Cas. No. 11,800, are even more free from technical rules than is the case with the equity courts.

But before entering upon a particular consideration of the claims made by this libelant, and the character of those claims and the evidence in this record concerning them, it seems desirable, for reasons which will more fully appear in a later portion of this opinion, that we should call attention to certain fundamental propositions which underlie the jurisdiction and powers of this court respecting the questions which arise in connection with the libel now before us.

We may observe that one who makes repairs or furnishes supplies to a vessel may have an action in personam to recover therefor, or he may have a right in rem against the ship, which enables him to cause the ship to be sold so that he may be repaid out of the proceeds. Under the maritime law, when unchanged by statute, his right to a lien against the ship depended upon the character of the ship. Thus in The General Smith, 4 Wheat. 438, 4 L. Ed. 609, decided by the Supreme Court in 1819, in an opinion written by Justice Story, it was decided

that by the common law materialmen, furnishing repairs to a domestic ship, have no lien upon the ship for their demand, although a lien exists for repairs made or necessities furnished to a foreign ship, or to a ship in a port of a state to which she does not belong. It appears .that a strenuous attempt was made to bring about a reconsideration of the question in Rodd v. Heartt, 21 Wall. 558, 22 L. Ed. 654, but the court held it to be a settled principle of American jurisprudence. Where supplies are ordered in the home port, or repairs are made in such a port, they are thought to be furnished on the personal credit of the owner, as ordinary goods are furnished. But in a foreign port, in the absence of the owner, the presumption is that the supplies are furnished or the repairs made on the credit of the ship.

Congress, however, by the Act of June 23, 1910, 36 Stat. p. 604, c. 373 (Comp. St. §§ 7783–7787), enacted that any person furnishing repairs, supplies, or other necessaries to a vessel whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and section 2 provides:

"That the following persons shall be presumed to have authority from the owner or owners to procure repairs, supplies, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted."

[1] In the case now under consideration libelant is seeking to recover the value of the labor and materials furnished, not by a proceeding in personam, but by one in rem, claiming that he has a lien on the vessel. A lien is an exception to the general rule, which entitled all creditors to participate equally in all the property of their debtor, and a maritime lien, as Mr. Justice Curtis pointed out in The Larch, 2 Curt. 427, 14 Fed. Cas. 1139, No. 8,085, being also a jus in re, which goes with the thing into the hands of purchasers, and so is embarrassing to commerce, is stricti juris; and in Astor Trust Co. v. E. V. White & Co., 241 Fed. 57, 60, 154 C. C. A. 57, 60 (L. R. A. 1917E, 526), the court declares that a maritime lien is "an equitable right, springing from the necessities of commerce."

[2] The right to proceed in rem is one which must be pursued in the admiralty courts; the right to proceed against the vessel in rem being distinctly an admiralty remedy, and as such exclusively within the jurisdiction of the admiralty courts of the United States. But the right to proceed in personam against the shipowner on his contracts money damages alone being demanded has always been within the common-law courts which have a concurrent jurisdiction with the courts of admiralty in such cases. Benedict's Admiralty, § 127.

[3] We observe also that while the courts of admiralty are not courts of equity, they proceed, as this court declared in Higgins v. Anglo-Algerian S. S. Co., Ltd., 248 Fed. 386, 160 C. C. A. 396, upon equitable principles. In Benedict's Admiralty (4th Ed.) § 261, it is said that the court of admiralty has "in certain respects the capacity of a court of equity," although it "is not a court of general equity,

nor has it the characteristic powers of a court of equity." The author adds that—

"It is bound, by its nature and constitution, to determine the cases submitted to its cognizance upon equitable principles, and according to the rules of natural justice. It cannot, in a technical sense, be called a court of equity. It is rather a court of justice."

In Brown v. Lull, 2 Summ. 443, 4 Fed. Cas. 407, No. 2,018, Mr. Justice Story said:

"Courts of admiralty are not, by their constitution and jurisdiction, confined to the mere dry and positive rules of the common law. But they act upon the enlarged and liberal jurisprudence of courts of equity, and, in short, so far as their powers extend, they act as courts of equity."

In The Kate, 164 U. S. 458, 469, 17 Sup. Ct. 135, 41 L. Ed. 512, the court declared that "good faith is undoubtedly required of a party seeking to enforce a lien against a vessel" for repairs or supplies furnished at the master's request, and it was said:

"Courts of admiralty will not recognize and enforce a lien upon a vessel when the transaction upon which the claim rests originated in the fraud of the master upon the owner, or in some breach of the master's duty to the owner, of which the libelant had knowledge, or in respect of which he closed his eyes, without inquiry as to the facts."

Mr. Justice Story, in The Virgin, 8 Pet. 538, 549 (8 L. Ed. 1036), speaking of the considerations which control courts sitting in admiralty, says:

"Such courts in the exercise of their jurisdiction are not governed by the strict rules of the common law, but act upon enlarged principles of equity."

In Kellum v. Emerson, 2 Curt. 79, 14 Fed. Cas. 263, No. 7,669, Mr. Justice Curtis said:

"It is often said that a court of admiralty is a court of equity, acting on maritime affairs. This is true when properly understood. A court of admiralty applies the principles of equity to the subjects within its jurisdiction."

In The Julianna, 2 Dods. Ad. 503, 521, it is said:

"A court of law works its way to short issues, and confines its views to them. A court of equity takes a more comprehensive view, and looks to every connected circumstance that ought to influence its determination upon the real justice of the case. This court certainly does not claim the character of a court of general equity, but it is bound, by its commission and constitution. to determine the cases submitted to its cognizance upon equitable principles, and according to the rules of natural justice."

It is said in The Harriett, 1 W. Rob. Ad. 183, 192, by Lushington, Judge of the High Court of Admiralty:

"If a court of equity would relieve, and a court of law could not, I consider that it would be my duty to afford that relief under the circumstances of the present case. The jurisdiction which I exercise is an equitable as well as a legal jurisdiction. and I must relieve the parties in this suit, if they are entitled to be relieved in law or in equity. It is therefore unnecessary for me to enter into a distinction whether the relief is at law or in equity."

When it is said that a court of admiralty proceeds according to principles of equity, it is necessary to understand exactly what is meant.

It certainly does not mean that a court of admiralty proceeds in all respects as a court of equity might do. For example, it does not mean that a court of admiralty can reform a maritime contract under the same circumstances that a court of equity would reform a contract within its cognizance. Williams v. Insurance Co. (D. C.) 56 Fed. 159; Meyer v. Pacific Mail Steamship Co. (D. C.) 58 Fed. 923. And it does not mean that a court of admiralty can decree specific performance. Benedict's Admiralty (4th Ed.) § 261. But it means that in respect to certain matters which are within its jurisdiction it proceeds according to the principles of equity.

In Pope v. Nickerson, 3 Story, 486, Fed. Cas. No. 11,274, it was said that a court of admiralty, in cases within its jurisdiction, acts as a court of equity, and construes instruments as a court of equity does, with a large and liberal indulgence. And in O'Brien v. Miller, 168 U. S. 287, 18 Sup. Ct. 140, 42 L. Ed. 469, Mr. Justice White (Chief Justice White) speaking of bottomry bonds, said:

"In the exercise of their jurisdiction with respect to such bonds, courts of admiralty are not governed by the strict rules of the common law, but act upon enlarged principles of equity."

In Toledo S. S. Co. v. Zenith Transp. Co., 184 Fed. 391, 399, 106 C. C. A. 501, 509, the Circuit Court of Appeals for the Sixth Circuit, speaking of a revocation of an agreement of submission to arbitration and the attitude of courts of law and of equity respecting it, said:

"But this suit is in admiralty, a branch of the law not hampered by the rigid rules of the common law, and which deals with causes upon considerations even more elastic than pertain to the broad jurisdiction of courts of chancery."

[4] In Carmen v. Fox Film Corporation, 269 Fed. 928, this court, sitting as a court of equity, refused affirmative relief to one coming into court with unclean hands respecting the transaction involved. Can a court of admiralty, administering justice upon equitable principles, dismiss this libelant because of fraudulent conduct in respect of the transactions involved herein? We think not.

In Hansen v. Barnard (C. C. A.) 270 Fed. 163, the master of a ship sought to recover compensation for his services. It appeared that he had rendered fraudulent accounts to the owner. We dismissed the suit in that case. But our decision in it went upon the theory that an agent forfeits his right to compensation, if he is guilty of fraud on his principal in the transaction of the agency. We did not find it necessary to consider, under the circumstances existing in that case, whether a court of admiralty would deny relief to one guilty of fraud and standing in no fiduciary relation.

There seems no analogy between the misconduct of a seaman, which leads a court of admiralty to deny the seaman a lien on the ship for his wages, and the misconduct of one who, like the libelant, furnishes labor or supplies to the ship, but is guilty of misconduct respecting the transaction. In the case of the seaman, his misconduct under the maritime law extinguishes his right to recover wages, and he can no more proceed in personam that he can in rem. In denying him his lien, therefore, the court is not proceeding upon equitable principles and

denying him relief because his hands are unclean. Relief is denied because his right is extinguished, both in rem and in personam. But the fraudulent conduct of a materialman does not extinguish his right to proceed in a common-law court in personam, and we are cited to no authority which shows that he loses his right to proceed in admiralty in personam or in rem to enforce his lien for work actually done or for supplies actually furnished. We are not aware that courts of admiralty in maritime cases remitted libelants to courts of law to obtain their rights, as courts of equity so frequently did in matters within the concurrent jurisdiction of both courts. The fact is that courts of admiralty exercise both a legal and an equitable jurisdiction, and there is no reason why it should send a suitor to a court of law in respect to maritime matters. In The Harriett, supra, as we have before remarked, Lushington, judge of the High Court of Admiralty, declared that the jurisdiction which he exercised was an equitable as well as a legal jurisdiction, and there is no doubt that courts of admiralty afforded legal as well as equitable relief.

What was said by the Supreme Court in The Lulu, 10 Wall. 192, 19 L. Ed. 906, as to the necessity of good faith, must be considered in the light of the circumstances of that case. The court certainly did not intend to lay down the broad proposition that a court of admiralty, like a court of equity, would deny relief in all cases to one guilty of bad faith. The Lulu was a New York vessel, and the repairs on her were made in Baltimore, and prior to the Act of June 23, 1910, to which reference has already been made. Under the law as it then existed, the right of a materialman to a lien on a foreign vessel depended upon whether or not he had knowledge or reasonable means of knowledge that the master had available funds or sources of credit, or that the vessel owner had made independent arrangements to supply necessary funds for the vessel's purposes. If he had such knowledge, he acquired no lien. If he had the actual or constructive knowledge above referred to, the implied lien did not arise. What was said as to good faith is to be understood as relating to the circumstances referred to.

That the libelant actually performed work for the ship and furnished her with certain materials cannot be denied. For such work and for such supplies the maritime law gives a lien. We do not think that a court of admiralty can deprive him of that right on the ground that he claimed fraudulently to have done more work than he did, or charged fraudulently for the labor or supplies he in fact furnished.

[5] This brings us to inquire whether we can examine the testimony in the record to determine for ourselves what labor the libelant performed, and what services he rendered, and what he is entitled to recover therefor. Are we concluded, as to the amount, by the findings of the commissioner, confirmed as they have been in all respects by the District Judge. In Munson S. S. Line v. Miramar S. S. Co., 167 Fed. 960, 93 C. C. A. 360, this court held that on an appeal in admiralty the whole case is open for trial de novo, and this is well-established law. Reid v. American Express Co., 241 U. S. 544, 36 Sup. Ct. 712, 60 L. Ed. 1156; The Louisville v. Halliday, 154 U. S. 657, Append., 14 Sup.

Ct. 1190, 25 L. Ed. 771; Irvine v. The Hesper, 122 U. S. 256, 7 Sup. Ct. 1177, 30 L. Ed. 1175; Merchants' Mutual Insurance Co. v. Allen, 121 U. S. 67, 7 Sup. Ct. 821, 30 L. Ed. 858; The Charles Morgan, 115 U. S. 69, 5 Sup. Ct. 1172, 29 L. Ed. 316; Chicago D. & G. B. Transit Co. v. Moore, 259 Fed. 490, 170 C. C. A. 466; Western Transit Co. v. Davidson, 212 Fed. 696, 701, 129 C. C. A. 232.

We are not unmindful of the cases which assert that the decision of a trial court in admiralty upon a question of fact, based upon conflicting testimony or the credibility of witnesses examined before the judge, is entitled to great respect, and will not be lightly reversed on appeal, unless there is a decided preponderance of evidence against it, or a mistake is clearly shown. The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477, 39 L. Ed. 620; The Lady Pike, 21 Wall. 1, 22 L. Ed. 499; Walsh v. Rogers, 13 How. 283, 14 L. Ed. 147; The City of New York, 54 Fed. 181, 4 C. C. A. 268; The Jersey City, 51 Fed. 527, 2 C. C. A. 365; The Buffalo, 55 Fed. 1019, 5 C. C. A. 388. And if testimony has been taken before a commissioner, and not before the judge below, and it is all before the appellate court, the decision of a trial judge on questions of fact is not entitled to the same controlling weight as where he saw and heard the witnesses testify. The Sappho, 94 Fed. 545, 36 C. C. A. 395; The Joseph B. Thomas, 86 Fed. 658, 30 C. C. A. 333, 46 L. R. A. 58; The Glendale, 81 Fed. 633; The Cayuga, 59 Fed. 483, 8 C. C. A. 188.

The appellate court is not, however, concluded by the fact that the witnesses were seen and heard by the District Judge. In The Ariadne, 13 Wall. 475, 20 L. Ed. 542, the Supreme Court used the following language:

"We are not unmindful that both the Circuit and District Court came to a conclusion different from ours as to the alleged fault of the steamer. Their judgments are entitled to, and have received, our most respectful consideration. Their concurrence raises a presumption, prima facie, that they are correct. Mere doubts should not be permitted to disturb them. But the presumption referred to may be rebutted. The right of appeal to this court is a substantial right, and not a shadow. It involves examination, thought, and judgment. Where our convictions are clear, and differ from those of the learned judges below, we may not abdicate the performance of the duty which the law imposes upon us by declining to give our own judicial effect."

In The Columbian, 100 Fed. 991, 41 C. C. A. 150, which was a case in the Circuit Court of Appeals for the First Circuit, counsel urged that, as the question was one of weighing conflicting evidence, the finding of the court below should be accepted as unassailable. The court, speaking through Judge Putnam, said, in the opinion which it rendered, that the practice in that circuit had been "to secure what the statute establishing this court intended to secure, not only a prompt hearing but a retrial of the case in accordance with the convictions formed from the record by the judges sitting on appeal."

This court in The Gypsum Prince, 67 Fed. 612, 14 C. C. A. 573—a case heard before Judges Wallace, Lacombe, and Shipman—considered it proper to disregard a finding of fact by the district judge under the circumstances there stated. The court, in a case heard before the same judges, in The Albany, 81 Fed. 966, 27 C. C. A. 28, declared

again that under the circumstances there stated there was no reason why the appellate court should not review the testimony for itself, unembarrassed by the findings below.

In Hughes, Admiralty Law (2d Ed.) § 203, the authority states that the intent of Congress to give an appeal on questions both of law and fact is clear, but that appellate courts have gone very far in practically refusing to review questions of fact where the District Judge has had the witnesses before him. He declares that this doctrine is largely an abdication of the trust confided in the courts of appeal, and for an admiralty court, smacks too much of the old common-law fiction as to the sacredness of a jury's verdict. He adds that this theory about the trial judge being endowed with clairvoyance because he saw the witnesses has degenerated into a mere makeweight for that filius nullius, the per curiam opinion. He then says:

"If the trial judge could decide cases at their close, as juries render verdicts, there would be more force in the idea. But in districts of crowded dockets, where numerous cases, each with numerous witnesses, are tried in rapid succession, and then taken under advisement for months, nothing short of a moving picture screen, with a photographic-phonographic attachment, could bring it back to the judicial mind. To give this amiable fiction the scope which it has often been given is in effect to deny an appeal on questions of fact, which the statutes are supposed to give. That seeing the witnesses is an advantage cannot be denied; but its importance has been grossly exaggerated. Surely the combined intelligence of the three appellate judges as against the one trial judge ought to overbalance it."

In the case now under consideration, the judge did not see and hear all the witnesses. He saw and heard only the libelant, his wife, and two other witnesses and their testimony constituted relatively a small part of the testimony in the record. Under the circumstances, we do not feel ourselves concluded by the findings, and we shall examine the testimony and reach our own conclusions. See La Bourgogne, 210 U. S. 95, 114, 28 Sup. Ct. 664, 52 L. Ed. 973; The Wildcroft, 201 U. S. 378, 387, 26 Sup. Ct. 467, 50 L. Ed. 794; The Carib Prince, 170 U. S. 655, 658, 18 Sup. Ct. 753, 42 L. Ed. 1181.

We come, now, to consider the facts of this case and the action of the court below. The question litigated on the trial was whether the master of the ship employed the libelant to do certain work on the ship as principal or as the representative or solicitor of one Olsen, who did an extensive business in repairing ships at Brooklyn; it being admitted that the libelant had been the solicitor for Olsen for some time, and that the master knew him because of that employment. The judge held that this was no defense to the action, and that the amount of the bills was "not exorbitant or incorrect," and directed that an interlocutory decree be entered and sent the case to a commissioner. Thereafter testimony was taken before the commissioner, who made a report that libelant was entitled to recover for the number of hours charged, viz. 3,460 hours, but at 45 cents per hour, instead of 80 cents; he also allowed for some of the supplies for which libelant charged; he also allowed the charges for 60 hours for one man in one night on the winches, and for 60 hours for each of five men in one night on the engine, but at 45 cents per hour, instead of 80 cents per hour; he also

allowed the charge of $50 for sweeping down the stack, holding that, even though there was a fire under the boiler at the time, conditions inside the stack were probably not very uncomfortable, as the weather was very cold; he also cut down the charge for launch hire and compensation insurance, and recommended a recovery by the libelant of $2,160.05, instead of $3,626, claimed in the libel, which, with interest, of $334.30, made a total of $2,494.35. The claimant filed exceptions to the report, which the judge overruled, and confirmed the report, and entered the usual decree in favor of the libelant for $2,690.85. From that decree this appeal has been taken.

[6] The testimony convinces us that the master of the steamship supposed that the libelant represented Olsen who had a place of business in Brooklyn and had always done the master's repair work. The master knew the libelant as Olsen's representative, and when he met him at Norfolk he told him to tell Olsen to have men meet him when the ship arrived in New York and clean the ship's tanks. It appears that on the arrival in New York the steamship was met by the libelant, who came in Olsen's launch, and was instructed by the master to go ahead with the work. The master testified that he understood Olsen was doing the work until he got the bill. The libelant had been in Olsen's employ for nine years, and for the last two years of his employment had been his foreman and solicitor, and held himself out as Olsen's representative, but had been discharged by Olsen a few weeks before the transactions herein involved. The master knew him simply as Olsen's employee. The libelant testified that he informed the master at Norfolk that he had been discharged by Olsen, but in view of the master's testimony we do not believe him. Good faith and honest dealing made it the libelant's duty to make the disclosure that he was no longer associated with Olsen and was acting for himself only. This he did not do, but, on the contrary, contrived to come to the pier in Olsen's launch when the Kalfarli reached New York, intending, no doubt, to strengthen the impression that he was still Olsen's representative. If a party conceals a fact that is material to a transaction, knowing that the other party is acting on the assumption that no such fact exists, the concealment may be as much a fraud as if the existence of the fact were expressly denied, or the reverse of it expressly stated. Thomas v. Murphy, 87 Minn. 358, 91 N. W. 1097; Gordon v. Irvine, 105 Ga. 144, 31 S. E. 151; Biggs v. Perkins, 75 N. C. 397; McKindly v. Drew, 71 Vt. 138, 41 Atl. 1039; March v. Mobile First National Bank, 4 Hun. (N. Y.) 466, affirmed in 64 N. Y. 645. Actionable fraud, it has been held, may be perpetrated by encouraging and taking advantage of a delusion known to exist in the mind of the other party. Busch v. Wilcox, 82 Mich. 315, 46 N. W. 940; Maynard v. Maynard, 49 Vt. 297.

[7] Fraud may consist in silence as well as in actual outspoken misrepresentation, and there are circumstances when the suppressio veri may be reprehensible as the suggestio falsi. The master of the ship supposed he was dealing with Olsen through Olsen's representative, and the libelant knew the master thought so, and, making no disclosure of the truth, took advantage of the situation to do the work with his

own men. Having been introduced to the master, according to his own story, as "Olsen's man," he should have informed the master that he no longer represented Olsen. This in our opinion he did not do, and the omission to do it under the circumstances amounted to a fraudulent deception. It was dolus malus, and not dolus bonus.

[8] Not only did the contract originate in a fraudulent deception, but the bill rendered was also fraudulent. When one puts in a bill in which he charges double the amount for work done that he is entitled to charge, and includes in it charges for work he did not perform, and does it deliberately and with knowledge the bill must be considered fraudulent. The bill which is the subject-matter of this libel is outrageously inflated, and the inflation is not due to inadvertence or carelessness; for as soon as the libel was filed the claimant filed elaborate interrogations, asking minutely as to the work, labor, and services alleged to have been rendered, and the time consumed in the performance of the services, and the amount charged for each item of work, labor, and services performed. This was filed on July 31, 1918, and the answer to the interrogations was not filed until October 16, 1918.

The libelant, in his statement of charges, as heretofore stated, gave the total number of hours of work, labor, and services performed as 3,460, for which he charged at the rate of 80 cents an hour. The commissioner found that this was excessive, and that 45 cents an hour should be allowed. The claimant called a disinterested witness, who at the time the libelant performed the work was a superintendent of shipyard and repair work and had been such for seven years prior to the time when this work was done. The following is an excerpt from his testimony:

"Q. Do you recall the prevailing rate of wages paid to boiler scalers in December, 1917, and January, 1918? A. At that time I was employed by James Shewan & Sons over there, and he paid, in 1917, 34 cents an hour for boiler scalers and tank scalers."

The claimant also called a boiler foreman at Olsen's, where the libelant had been employed prior to his discharge, previously referred to. He testified that at the time when this work was done boiler scalers were paid at Olsen's yard $2.75 a day, and that foreman received $3.50. He also called a consulting engineer, by whom scaling bills had to be approved before they were paid, and who testified that scalers were paid $2.75 a day. He put on the stand, too, one of libelant's own workmen, who was engaged on the work for which libelant seeks to recover. He testified that when he began the work the libelant paid him $3 a day, but before the work was concluded he was paid $3.50 a day, and that that was the highest amount he received. It thus appears that libelant was charging nearly twice what he was entitled in good faith to charge for wages paid, even assuming his statement as to the number of hours was correct.

We have examined the reductions with care, and the fault we find is not that they were made, but that they were insufficiently made. The commissioner allowed pay at the rate of $4.50 a day of 10 hours, or 45 cents an hour. This was based on an allowance of $3.50 to each man and an overhead charge of $1 a day for each. The evidence al-

ready cited shows that at the time this work was done the prevailing rate of wages was from $2.75 to $3 a day. The amount due should be fixed at the rate of $4 a day, or 40 cents an hour.

The commissioner did not reduce the number of hours the libelant claims his men worked. We believe that the statement is inaccurate and more or less inflated. An illustration of its inaccuracy is afforded by the fact that the libelant charges for the time of 12 men working 10 hours each on December 26th. We are satisfied that the work did not begin until December 27th, as the engineers in charge of the Kalfarli testify, and as the vouchers for the wire and zinc brushes which the men used show. This error alone involves 120 hours.

The total number of hours of work is determined by ascertaining the number of men employed and the number of hours each man worked. The testimony as to the number of men who were employed on the job is very contradictory. The libelant's attempt to support his claim as to the number of hours the men worked by the testimony of his foreman does not help his case. How satisfactory and reliable that testimony was may be judged by the following excerpt from his testimony:

"Q. It appears here that on Thursday, the 27th, and Friday, the 28th, you worked 46 hours on each day? A. Yes.

"Q. Does that mean that you went on board the ship Thursday morning at 7:30 and worked through until 7:30 Friday morning without a rest? A. Yes.

"Q. Without any sleep? A. Yes.

"Q. You worked through 48 hours, right from 7 o'clock on Thursday morning till 7 o'clock on Friday morning; then on Saturday you worked 10 hours more? A. Yes.

"Q. So that you worked 58 hours consecutively without sleep? A. Yes.

"Q. You didn't sleep a wink during that time? A. No—that is up to me.

"Q. Mr. Lundstrom, you are under oath; you are swearing to this, now? A. I know it; but, when you ask me such a question, I must answer that way. You know a man working like that will take any chance he can, without asking or telling anybody.

"Q. As a matter of fact, you did not work through from Thursday morning at 7 o'clock until Saturday night at 4 o'clock without taking any rest? A. I did not.

"Q. It would be impossible for you to do that, wouldn't it? A. Yes.

"Q. And the same thing applies to these other men; is that not so? A. Yes.

"Q. That whenever they got a chance to take a nap they took a nap? A. If I was working, and the chief engineer came along and said to me. 'Mr. Lundstrom, go into my room and take a nap,' am I supposed to tell anybody that and cut it out of my pay? No."

The libelant claimed that on a certain day each of his men had worked and was paid for 46 hours. Asked to explain he did as follows:

"Q. How many hours? A. 10 hours. They only work 8 hours; from 4 to 8 in the afternoon is 4 hours again, which makes 10 hours for the men. And from 8 to 12 is another 4 hours, which makes another 10 hours, there is 30, and from 12 to 4 o'clock in the morning is 4 hours, and that makes 40 hours; and from 4 to 7 o'clock in the morning is 3 hours, double time, 6 hours, makes 46 hours. That is what I had to agree with the men to get them to work, and what I had to pay for it."

On New Year's Day he claimed each man worked 56 hours. This is an excerpt from his testimony in reply to an inquiry as to how he figured it:

"A. We worked from the 31st and the night of the day before.

"The Court: They had been at work all day on the 31st, and up to midnight—

"The Witness: And to the New Year's Eve.

"The Court: Start at 12 o'clock and then to 4. How many hours?

"The Witness: From midnight that would be 30 hours, to 4'oclock is 40 hours, and from 4 to 8, that is 50—well, my foreman can explain it; he did not get paid for nor more than 56 hours.

"Q. In other words, you cannot tell how a man can work 56 hours? A. He has paid for 56 hours.

"Q. I am asking you how these men could work for 56 hours during a 24-hour period on New Year's day? A. That is the time I took off the foreman—

"Q. You do not know? A. I would not say that for sure, because I don't know. I know we were paying it."

The claimant was under the impression that, in estimating the total number of hours charged for, the libelant had included the hours his men had worked on the boat in doing certain work under a special contract for which a separate charge had been made. The foreman was asked as to this, and the following is an excerpt from his testimony:

"Q. Do you think it would be proper for Mr. Andersen to charge 80 cents per hour for doing that work, and still charge for those men's time for just the general work? A. That is up to him.

"Q. That would be doubling up, wouldn't it? A. No.

"Q. Why wouldn't it, if a charge was made for 16 men doing a special contract during December 26 and December 27, and then in addition a charge was made for their time in those 3,460 hours, which you say were actually put in on the job, wouldn't that be doubling up on the job?

"Mr. Cuff: I object to that as being argumentative.

"A. That is between the boss and the chief engineer."

The commissioner has allowed for sweeping down the smokestacks, which in our opinion the libelant's men did not do. The item rests upon the testimony of libelant's foreman, above referred to, and which was accepted by the commissioner, but which we believe was utterly untrustworthy. The two engineers on the vessel testified in the most positive terms that it had not been done. The following is an excerpt from the testimony of one of them:

"Q. Do you know whether the smokestack was swept down? A. It was not.

"Q. It was not done? A. No.

"Q. Did you have a fire all the time you were in port? A. Yes; in one of the main boilers.

"Q. All the time? A. Yes; all the time.

"Q. Was it possible to sweep the smokestack down when there was a fire? A. No.

"Q. It could not be done? A. No."

And the following excerpt is from the testimony of the other:

"Q. Did you clean the smokestack? A. No.

"Q. Did you have a fire in the boiler all the time you were in New York? A. Yes; all the time.

"Q. Could they sweep the smokestack when there was a fire in the boiler? A. No."

The foreman's testimony was that they went inside the smokestack, and cleaned it, but that the steam was on, but low down, and the fire was banked. But the testimony is that the vessel was an oil burner,

and that it is impossible to bank the fires of an oil burner. One of the employees testified as follows:

"Q. What kind of a vessel was the Kalfarli? Was she a coal or oil burner? A. Oil burner.
"Q. Is it possible to bank the fires in an oil burner? A. No."

The boilers must have had considerable steam, on as they operated the winches, and it is inconceivable that workmen would go down inside the stack of a steamer to sweep it out when the fires were going, and had been going all day to make steam for the winches.

Included in the charges for which the libelant seeks payment are two items, aggregating $84.55, for the use of launches in transporting his men to and from the ship while she was lying in the stream and before she was brought to the pier, between December 26th and January 5th. The commissioner cut this item down to $6. He was asked on cross-examination how many days the boat lay at the pier, and how many days out in the stream, but was unable to say, although he admitted she came up to the pier on December 26th, and we have stated our opinion that the work on her did not commence until December 27th. The claimant put on the stand one of the men employed on the work. As he testified that he worked on the boat 8 or 10 days, he must have been on the boat during almost the entire time, if not the whole of the time, the libelant's work upon her was under way, as that work commenced on December 27th and ended on January 5th. He stated that, when he began his work, the vessel was at the pier, and that she remained there while he was at work on her, and that he never used a launch in order to get to the boat. We believe him to have been a disinterested and truthful witness.

We are satisfied that there are numerous other errors which we do not deem it necessary to point out in detail. As the libelant has rendered labor and services to the ship, it is clear that the law gives him a lien on the ship, of which he cannot be deprived, even though the contract originated in deception, and the bill rendered is in some respects grossly inaccurate, and extortionate, if not actually in some respects fraudulent. We think, in view of all the circumstances, that justice will be done if a decree is entered in favor of the libelant in the amount of $1,700, without interest, and without costs in the District Court, and that he should be charged with the costs of this court.

As so modified, the decree is affirmed.